In the Matter of the EXCESS SUR-PLUS STATUS OF BLUE CROSS AND BLUE SHIELD OF MINNESO-TA.

No. C5–99–1383.

Supreme Court of Minnesota.

April 12, 2001.

David Aafedt, Assistant Attorney General, St. Paul, for appellant.

Meagher and Geer, P.L.L.P., John J. McDonald, Jr., Jenneane L. Jansen, Minneapolis, for appellant/intervenor.

Robins, Kaplan, Miller & Ciresi, L.L.P., Michael V. Ciresi, Deborah J. Palmer, David W. Beehler, and Joel A. Mintzer, Minneapolis, for respondent.

Alan I. Gilbert, Chief Deputy and Solicitor General; Chestnut and Cambronne, P.A., Karl L. Cambronne and Jeffrey D. Bores; Heins Mills & Olson, P.C., Samuel D. Heins, Daniel E. Gustafson, and Daniel C. Hedlund; Lockrige Grindal Nauen, P.L.L.P., Hugh V. Plunkett and Robert K. Shelquist, for amicus.

## OPINION

STRINGER, Justice.

Respondent BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota (hereinafter BCBSM) initiated legal proceedings against Philip Morris, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, B.A.T. Industries P.L.C., Lorillard Tobacco Company, The American Tobacco Company, Liggett Group, Inc., The Council for Tobacco Research–U.S.A., Inc., and The Tobacco Institute, Inc. in 1994 alleging that

as a result of the unlawful conduct of the tobacco companies, BCBSM has been damaged by paying substantially higher claims to its contracted health care providers due to smoking-related illnesses. A settlement was reached in 1998 providing for the payment to BCBSM of approximately $469 million with an estimated present value of $434 million at the time of the administrative proceedings in this matter. BCBSM was notified by the Department of Commerce (department) that receipt of the settlement proceeds would cause BCBSM to exceed its allowable surplus under Minn.Stat. § 62C.09 (2000) and therefore it must submit a plan for the department's approval to adjust its operations to bring the surplus into compliance. Upon submission and consideration of the plan in a contested case proceeding, the administrative law judge (ALJ) presiding over the evidentiary hearing recommended approval of the plan, but the Deputy Commissioner of Commerce (deputy commissioner), acting pursuant to a delegation of authority from the Commissioner of Commerce to make the final decision in the matter, disagreed and denied approval. On certiorari to the court of appeals, the court concluded that the record "manifestly" supported approval of the BCBSM plan, reversed the deputy commissioner's order disapproving the plan and remanded the matter to the commissioner for implementation. Following a thorough review of the record herein we reverse the court of appeals.

The statutory framework relating to review of BCBSM's proposed plan is the Nonprofit Health Service Plan Corporations Act[2] prescribing, among a variety of

2. The act is codified at Minn.Stat. ch. 62C (2000). The statement of purpose is codified at Minn.Stat. 62C.01, subd. 2 (2000):

It is the purpose and intent of Laws 1971, chapter 568 to promote a wider, more economical and timely availability of hospital, medical-surgical, dental, and other health services for the people of Minnesota, through nonprofit, prepaid health service plans, and thereby advance public health and the art and science of medical and health care within the state, while reasonably regulating the formation, continuation, operation, and termination of such service plans by establishment and enforcement of reasonable and practical standards of administration, investments, surplus and reserves.

regulations, the capital structure of non-profit health service plan corporations such as BCBSM. *See* Minn.Stat. § 62C.09. With respect to the matter before the court, the act requires BCBSM to maintain adequate cash reserves to pay its health service claims and related administrative expenses and retain sufficient surplus funds to serve as a volatility cushion. Minn.Stat. § 62C.09, subds. 2 and 3 (2000). Directly on point here, the act further provides that if BCBSM has excess surplus, its "operations shall be adjusted to correct the condition, according to a written plan proposed by the corporation and approved by the commissioner [of commerce]." Minn.Stat. § 62C.09, subd. 4 (2000).

The legislature has granted the commissioner, under Minn.Stat. § 60A.03, subd. 2 (2000), the authority to administer and enforce "all the laws of this state relating to insurance," including monitoring the financial condition of nonprofit health service plan corporations like BCBSM, and the commissioner's authority to approve a written plan submitted by a nonprofit health services corporation to correct its excess surplus condition is a part of that broad authority. Minn.Stat. ch. 62C. The commissioner is entrusted *inter alia* with ensuring that BCBSM charges reasonable rates "in relation to the benefits, considering actuarial projection of the cost of providing or paying for the health services, considering costs of administration, and *in relation to reserves and surplus required by law.*" Minn.Stat. § 62C.15, subd. 1 (2000) (emphasis added). As a nonprofit health service plan corporation, BCBSM is subject to a minimum surplus reserve of the greater of the initial surplus minus $100,000 or 16 ⅔ percent of the sum of all health service claims and administrative expenses incurred in the most recent calendar year, and a maximum surplus of 33 ⅓ percent of claims and expenses in the most current calendar year. *See* Minn. Stat. § 62C.09, subd. 3. This is known as the "surplus corridor." Believing that the settlement would cause BCBSM to have

surplus in excess of the 33 ⅓ percent allowable, the commissioner notified BCBSM that it must submit a plan of action to eliminate the excess surplus, and determined that a hearing relating to the plan would be conducted pursuant to the contested case procedures under the Minnesota Administrative Procedures Act (MAPA).

MAPA sets forth the statutory procedural requirements imposed on administrative agencies in the course of carrying out their powers and duties, *see* Minn.Stat. ch. 14 (2000), including those related to monitoring levels of reserves and surplus. The approval of a plan submitted by a health service plan corporation under Minn.Stat. § 62C.09, subd. 4 (2000) is a determination of the rights of specific parties rather than an agency statement of general applicability and future effect. *See* Minn.Stat. § 14.02, subds. 3 and 4 (2000) (definitions). The parties' constitutional due process rights must be respected in the context of a contested case proceeding but the commissioner also has the authority to dispose of contested cases through stipulation, agreed settlement, consent order or default. *See* Minn.Stat. § 14.59 (2000).

Following the $469 million settlement, BCBSM and the department entered into a consent cease and desist order shaping the issues in dispute by providing that the commissioner had jurisdiction over the BCBSM surplus, that BCBSM would refrain from spending the settlement funds until its proposed plan had been approved with the exceptions that BCBSM could satisfy tax liability incurred as a result of the settlement and reduce its tax liability by making a donation to a charitable organization upon consultation with the commissioner. BCBSM then filed a corrective action plan with the commissioner proposing to reduce its excess surplus by creating a "Tobacco Cessation Pharmacy Reserve" (pharmacy reserve) and "Tobacco Cessation and Other Health Risk Behavior Programs" (health behavior program).

The pharmacy reserve would pay for pharmaceutical smoking cessation aids for insured members of BCBSM for the next 20 years without imposing any premium charge on subscribers for the drug benefit. The health behavior program would educate insured members of BCBSM for the next 20 years about the benefits of adopting healthy habits such as quitting smoking, getting immunizations, exercising, and following safety precautions.

Although not required by Minn.Stat. § 62C.09, the commissioner exercised his authority under Minn.Stat. § 45.027, subd. 1(3) (2000) and Minn.Stat. § 60A.03, subd. 2 to call a public hearing and provide all interested parties an opportunity to be heard regarding the BCBSM plan. The notice of hearing issued by the commissioner invited intervention by interested parties, solicited public comment and provided that the contested case proceeding would determine whether the commissioner should approve or disapprove BCBSM's plan for adjustment of its operations to correct its excess surplus status pursuant to Minn.Stat. § 62C.09. The notice identified the issues to be addressed at the hearing: 1) whether the proposed plan meets the requirements of Minn.Stat. § 62C.09; 2) whether the proposed plan is fair and equitable to the subscribers of BCBSM; 3) the impact of the proposed plan on the regulation and orderly operation of the insurance and health industries in Minnesota; and 4) whether the proposed plan is in the public interest of the citizens of Minnesota.

The notice of hearing appointed an administrative law judge (ALJ) and granted the ALJ the authority to issue orders pertaining to pre-hearing discovery and admissibility of evidence, conduct an evidentiary hearing and prepare a report and recommendation for the commissioner. The commissioner directed the ALJ to certify motions and questions to the commissioner or commissioner's designee where appropriate upon consideration of the factors listed in Minn. R. 1400.7600 (1999). The commissioner reserved for the agency decision-maker the authority to issue the final findings of fact, conclusions of law and order approving or disapproving the plan, along with the authority to make the final decision regarding scheduling, party intervention and standing, and other items. The commissioner determined the department would participate as an advocate in the matter and delegated the agency decision making authority in the matter to Deputy Commissioner LaVasseur (deputy commissioner) under Minn.Stat. § 45.024, subd. 2 (2000).[3] The commissioner and Deputy Commissioner Nelson, head of the insurance and registration division, acted as department advocates in the proceedings.

Following the initiation of the public hearing[4] and the delegation of authority to

3. *See* Consent Order of December 31, 1998 ("After the hearing record is closed and the ALJ has transmitted his Findings of Fact, Conclusions of Law and Recommendation, a Deputy Commissioner of Commerce, acting with the authority of the Commissioner pursuant to delegation under Minn.Stat. § 45.024, subd. 2, will decide whether to approve or disapprove the Proposed Plan.").

4. The public hearing was conducted pursuant to the notice of hearing issued by the commissioner, the contested case procedures of the MAPA set out in Minn.Stat. §§ 14.57–14.69 (1999) and the rules of the Office of Administrative Hearings, Minn. R. §§ 1400.5100–1400 .8400 (1999). Upon initiation of contested case proceedings, an ALJ is assigned to the case by the Chief Administrative Law

Judge of the Office of Administrative Hearings, an office of the executive branch empowered to hold adversary hearings, take testimony, view exhibits and make findings of fact and conclusions of law. *See* Minn.Stat. § 14.50 (2000). The ALJ has authority to carry out the duties delegated by the agency ordering the hearing and is charged with the task of ensuring that "hearings are conducted in a fair and impartial manner" and in accordance with the requirements of Minn.Stat. § 14.50 and Minn. R. §§ 1400.5100–14.00.8400. The parties may engage in settlement conferences on their own prior to the hearing, *see* Minn.Stat. § 14.59, or request an ALJ to preside over a settlement conference. Minn. R. 1400.6550 (1999).

the deputy commissioner, the commissioner and other department staff continued to engage in discussion of the plan with BCBSM. In response to a statement by the commissioner that the plan should contain more immediate benefits for BCBSM members, BCBSM amended its plan to redirect $80 million of the funds originally proposed for the health behavior program to a two and a half year "Member Health Awareness" program (health awareness program) of quarterly mailings to all BCBSM members of health information and health-related merchandise such as vegetable steamers to promote healthy eating, booklets describing how to avoid home injuries, child window decals and smoke detectors for fire safety.

While discussions continued between BCBSM and department advocates, public comment was received into the record and interested parties submitted petitions to intervene. Plaintiffs in proceedings commenced by Dakota County BCBSM subscribers[5] argued at a prehearing conference before the ALJ and a second prehearing conference before the deputy commissioner that the administrative proceedings should be stayed pending the issuance of a decision by the court of appeals regarding their appeal of the Dakota County suit. The deputy commissioner denied the request for a stay.[6]

Meanwhile, former BCBSM subscriber Scott W. Johnson and group subscriber Twin Cities Federal (TCF) petitioned for and were granted permission to file briefs without acquiring party status but later Johnson was allowed to intervene with full party status. HealthPartners, a major competitor of BCBSM in the Minnesota health insurance industry, was also granted leave to intervene with full party status.

The ALJ ordered the parties to file their objections to the plan. HealthPartners' objections were based primarily on its contention that BCBSM's plan would disrupt the health insurance market in Minnesota. Johnson and TCF objected on the basis that BCBSM received the settlement proceeds in trust on behalf of its members and could only use the funds for reduction of premiums or as a rebate. Johnson and TCF also claimed that the plan's goal of serving the public at large exceeds the scope of activities a nonprofit health service plan corporation such as BCBSM may engage in under Minn.Stat. ch. 62C. They argued that a rebate would be an equitable and practical way to disburse the settlement proceeds and objected to the plan's stated goals to serve the public at large as *ultra vires*. Department advocates objected to the plan on the basis that it set aside excessive funds for payment of potential tax liability, it did not contain enough detail regarding the health awareness and health behavior programs, nor did it provide monitoring objectives, require BCBSM to provide regular reports of its activities and updated financial projections to the department, or require BCBSM to submit modifications to the plan for department approval. After negotiations with the department, BCBSM agreed to

---

5. The subscribers brought suit in Dakota County arguing that the settlement proceeds belonged to them. The suit was dismissed on the basis that the commissioner had primary jurisdiction over the disposition of surplus funds under Minn.Stat. ch. 62C.09. *In re Blue Cross & Blue Shield Subscriber Litigation*, No. C3–98–7780 (Dakota County Dist. Ct. September 24, 1998), *aff'd*, No. C5–98–1826, 1999 WL 203762 (Minn.App.), *rev. denied* (Minn. June 29, 1999).

6. The plaintiffs in the Dakota County subscriber litigation did not seek to intervene in the contested case proceeding and now appear before this court as amicus curiae. A group of former BCBSM subscribers led by American Continental, Inc. appear as amicus and argue that the dismissal of their suit against BCBSM on the basis that the commissioner had primary jurisdiction over the surplus funds was incorrect because the deputy commissioner's order disapproving the plan concluded that he did not have jurisdiction to decide the subscribers' common law claims. We make no ruling regarding the claims of amicus as they did not intervene in the administrative proceedings despite ample opportunity to do so.

move $49 million from the tax reserve component of the plan to the health behavior program and to provide assurances that funds not paid as taxes would be applied toward benefits for subscribers under other components of the plan. In December of 1998 BCBSM entered into a consent order that specified the agreed upon changes and resolved many of the department's objections to the plan.

HealthPartners and Johnson continued to object to the consent order however, and discussions were held between the parties in an effort to reach a settlement. Three days before the evidentiary hearing, the commissioner and BCBSM signed an amended consent order resolving Health-Partners' objections by adding additional financial reporting requirements, provisions for oversight of program development by the commissioner, independent analysis of the impact of implementation of the plan on BCBSM, its subscribers, and the insurance market, and methods by which the commissioner could enforce BCBSM implementation of the plan. HealthPartners thereupon withdrew from the proceedings. The amended consent order again referenced the authority of the deputy commissioner to approve or disapprove the plan.[7]

At the evidentiary hearing before the ALJ, BCBSM presented its plan. The components presented included the $80 million "Member Health Awareness Program" that would mail information and merchandise to BCBSM subscribers to raise awareness about home safety, fitness, nutrition, emotional health and other topics. The 20 year, $109.9 million "Tobacco Cessation Pharmacy Reserve" would allow BCBSM subscribers to receive smoking cessation aids such as nicotine gum with a

doctor's prescription without paying a higher insurance premium for the addition of the smoking cessation aids to the BCBSM formulary. The 20 year, $148.1 million "Tobacco Cessation and Other Risk Behavior Program" public health initiative would be delivered to subscribers in hospitals, schools and work sites to educate about quitting smoking, fitness, healthy eating, immunizations and other health behaviors. Finally, the BCBSM plan included a $75 million tax liability fund and a $21 million donation to the BCBSM Foundation.

BCBSM presented expert testimony regarding the benefits of its plan to its subscribers and the state. BCBSM experts testified that public health education initiatives such as the health behavior program can improve the health of populations and lower health care costs dramatically, and that to reduce duplication with other programs funded by tobacco settlement funds, it would be coordinated with MPAAT, an entity funding tobacco cessation programs through tobacco litigation settlement funds.[8] BCBSM experts testified that the pharmacy reserve would complement the health behavior program by providing medications to those receiving education about quitting smoking, presented information about the health care costs associated with smoking and projected health care savings resulting from successful attempts by its tobacco addicted health insurance subscribers to quit smoking. BCBSM admitted that the health awareness program was not yet fully developed and did not predict health care savings from this component of its plan.

Deputy Commissioner Nelson testified regarding the oversight and financial reporting requirements imposed upon

---

7. *See* Amended Consent Order of January 22, 1999 ("Nothing in this Amended Consent Order, however, limits the discretion of the Deputy Commissioner, acting with the authority of the Commissioner pursuant to delegation under Minn.Stat. § 45.024, subd. 2 (1998), presiding over the hearing to approve or disapprove the Proposed Plan.").

8. The Minnesota Partnership for Action Against Tobacco (MPAAT) is a court-approved administrative body coordinating the distribution of $202 million of the tobacco litigation settlement funds.

BCBSM by the consent order and the amended consent order. Nelson stated that the department's concerns regarding the plan were resolved by the amended consent order, and that the department recommended the plan be approved.

Intervenors Scott W. Johnson and TCF argued against the plan on the basis that the tobacco litigation settlement proceeds represent a portion of health care premiums to cover health care costs associated with smoking that were paid to BCBSM by former insurance subscribers and should be returned to them. Intervenor Johnson testified that the interests of those who paid the higher premiums were not taken into account in the plan, contrary to BCBSM's assertion in subsequent public statements that it was acting on behalf of the subscribers when the lawsuit was filed.

Comments supporting the plan were submitted by nonparty members of the public including private citizens, current BCBSM subscribers, business people, health care professionals, school officials, police officers, individuals employed in nonprofit organizations, an official from the U.S. Department of Health and Human Services, and others. A letter submitted by former Surgeon General C. Everett Koop described the negative effects of smoking, praised the plan and asserted that spending the settlement proceeds as proposed by the BCBSM plan would benefit the most people and achieve the most good.

Comments in opposition to the plan were submitted by the Minnesota Attorney General, the Minnesota Chamber of Commerce, and others. Several elderly subscribers submitted letters describing the rise in health insurance premiums. Counsel for TCF submitted oral comment criticizing the plan for squandering the funds on "a bunch of cheap trinkets" such as vegetable steamers, state park stickers, stress test wallet cards and other items. Written comments submitted by the Minnesota Attorney General criticized the

health awareness component of the plan as nothing more than "a public relations gimmick with regard to its future subscribers." The attorney general contended that the products and services that would be given to subscribers would be in the nature of a dividend to obtain future business and eliminate competition. He argued that the plan was unfair because the majority of those who paid the price for the tobacco-related health costs through higher premiums would not receive the benefits of the proposed programs and urged that the excess surplus be refunded to the policy holders who paid it. The attorney general criticized the accounting methods proposed for the pharmacy reserve as improperly treating the program funds as a liability and expressed concern that this would create a precedent allowing other insurers to create current reserves to pay for items which the insurer is not obligated to provide. Written comments submitted by the Minnesota Chamber of Commerce questioned the health awareness component of the plan as "highly untested with no measurable predictions on the long-term savings." The chamber of commerce also questioned whether the products that would be funded through the pharmacy reserve would be as effective as BCBSM claimed in helping subscribers quit smoking and urged that California's program for research and smoking cessation funded through tobacco litigation settlement proceeds be evaluated before further funds are spent on similar programs in Minnesota. Both the attorney general and the chamber of commerce raised concerns about disruption to the stability of the health insurance market in Minnesota.

In summary, BCBSM presented testimony praising the plan at the hearing, and the department presented testimony that the department's concerns were resolved by the consent orders and the department was recommending approval. Intervenor Johnson argued against approval of the plan. The majority of the public comment submitted was positive; out of almost 100

written comments filed, 15 clearly opposed approval. Only one of the 19 oral comments clearly opposed the plan.

## I.

Following the conclusion of the hearing, the ALJ issued 199 findings of fact, 33 conclusions of law, a memorandum detailing the reasoning behind the final recommendation, and a recommendation that the BCBSM plan be approved. As to the four issues framed by the commissioner, the ALJ, in summary, ruled as follows:

i. Does the plan meet the requirements of Minn.Stat. 62C.09, subd. 4 that operations be adjusted to correct the excess surplus condition within a reasonable time?

The ALJ found that the plan proposed by BCBSM as modified by the January 1999 amended consent order would eliminate the excess surplus by the year 2005, "if [BCBSM] incurs an additional tax liability of $49 million." Therefore, the plan corrects the excess surplus within a reasonable time. The ALJ noted that the department advocates agreed with this conclusion.

ii. Is the plan fair and equitable to BCBSM subscribers?

The ALJ found that tobacco usage is the number one preventable cause of illness in the United States and a multi-faceted approach like the BCBSM plan that includes drugs and counseling is necessary to achieve significant smoking cessation success rates. Quitting smoking will result in immediate health benefits for BCBSM subscribers who currently smoke, and the BCBSM plan will improve the health of its members and achieve health care savings in the long term. The ALJ found that based on the assumptions behind the pharmacy reserve, BCBSM anticipates achieving approximately $1 billion savings due to cumulative reduction in health care costs by the end of the program and that for every dollar spent on the health behavior program, $2 to $5 in health care savings will result. These savings will ultimately be passed on to future BCBSM subscribers as an approximate 2.3% reduction in the rate of anticipated premium growth over the next two decades. The ALJ found that to the extent non-renewing members who enroll in new health plans have quit smoking because of BCBSM programs, other health plans will experience lower health care costs.

The ALJ rejected intervenors' arguments that the only method of correcting the surplus would be to rebate the funds to the subscribers who paid them. The ALJ reasoned that current BCBSM subscribers would gain more in quality of health and reduced health care cost than would be paid in rebates. The ALJ found that BCBSM considered and rejected a rebate option and that it would be difficult and costly for BCBSM to identify members from the time frame covered by the tobacco litigation and determine how much money each member would be entitled to claim. The ALJ also found that Intervenor Johnson agreed that BCBSM's complaint in the tobacco lawsuit allows BCBSM to spend some of the settlement proceeds in furtherance of its plan, that benefits can take many forms, and that if the tobacco litigation was exclusively brought as a direct action Intervenor Johnson would agree with BCBSM's plan. The ALJ also found that there are significant tax savings to BCBSM under the plan which would be lost if BCBSM instead gave rebates to past subscribers. Therefore, the ALJ concluded that rebates would not be fair and equitable to subscribers because they would have little health benefit, the present value of rebates would be less than the potential benefits of the proposed public health programs, and litigation over the rebates would squander the settlement proceeds.

iii. What impact will the plan have on the regulation and orderly operation of the insurance and health industries in Minnesota?

The ALJ found that BCBSM did not develop its plan to improve its market share and although the amended consent order does not guarantee that there will be no market impact, it provides assurance that marketplace impact will be limited. Noting HealthPartners' statement that its objections relating to market impact were appropriately addressed by amendments to the BCBSM plan, and that Allina Health system, the other major competitor in the Minnesota marketplace, submitted a written comment in support of the plan, the ALJ concluded that the plan contained reasonable reporting and accounting procedures. The ALJ determined that the plan would not adversely impact the regulation and orderly operation of the insurance and health industries in Minnesota.

iv. Is the plan in the public interest of the citizens of Minnesota?

The ALJ found that the department had negotiated with BCBSM to make alterations to the plan and department advocates were satisfied that the plan would serve the public interest. In addition, most of the public comments submitted were in favor of the plan. He concluded that the plan would benefit the public by providing funds for research into addiction and the information gathered will be shared with other organizations. The ALJ found that BCBSM contracts with 97% of the physicians and all the hospitals in the state and because the BCBSM program would train providers to implement better practices, Minnesota providers would learn how to help both their BCBSM and non-BCBSM patients. The ALJ also found that the gains in health brought about by the BCBSM plan will result in lower claims to other insurers in the marketplace who would be able to charge lower premiums, and that the funds donated to the BCBSM Foundation would be used for programs that benefit the community. Based on these findings the ALJ concluded that the plan was in the public interest of the citizens of Minnesota.

As all four issues framed by the commissioner for review of the plan were resolved favorably to the plan proposed by BCBSM, the ALJ recommended to the deputy commissioner that the plan be approved.

 Upon issuance of the ALJ's report containing findings, conclusions and a recommendation of approval, the record was certified to the department for the deputy commissioner's review.[9] The deputy commissioner was required to make an independent decision based on the record before him, *see City of Moorhead v. Minn. Pub. Utils. Comm'n*, 343 N.W.2d 843, 846 (Minn.1984), and his final decision must be supported by substantial evidence which we have defined in part as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cable Communications Bd. v. Nor-West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn.1984). He was not required to treat the ALJ's recommendation with the same deference an appellate court must accord the findings of a trial court, as the ALJ's report is only one part of the record. *City of Moorhead*, 343 N.W.2d at 847.

██ Although the agency decision-maker may not consider evidence that has not been made part of the record in the determination of the case, *see* Minn.Stat. § 14.60, subd. 2 (2000), agencies may "utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence in the hearing record." Minn.Stat. § 14.60, subd. 4 (2000). Agencies must make their own "independent decisions and not * * * 'rubber stamp' the findings of a hearing examiner." *City of Moorhead,* 343 N.W.2d at 846. *See also*

---

9. The deputy commissioner advised the parties of the opportunity to file exceptions and arguments regarding the ALJ's recommendations. *See* Minn.Stat. § 14.61 (2000). Intervenor Johnson and the department timely filed their exceptions and arguments. In his discretion the deputy commissioner also considered correspondence filed by Intervenor Johnson and BCBSM after the stated deadline.

*People for Envtl. Enlightenment & Responsibility (PEER), Inc. v. Minn. Envtl. Quality Council,* 266 N.W.2d 858, 873 (Minn.1978).

## II.

On July 1, 1999 the deputy commissioner denied approval of the BCBSM plan on the basis that it was not fair and equitable to BCBSM subscribers, it was not in compliance with the statutory mandate that BCBSM reduce its excess surplus within a reasonable time, it wrongfully permitted BCBSM to maintain control of the funds, it would have an adverse impact upon the orderly operation and regulation of the health insurance market in Minnesota, and it was not in the public interest. The final order issued by the deputy commissioner adopted approximately three-quarters of the ALJ's 199 findings of fact, modified 15 and struck 38. He struck 10 of the ALJ's 33 conclusions of law, added 11 of his own, and issued a 19 page memorandum detailing his reasoning.

Along with many minor modifications to the ALJ's recommended findings of fact in which the deputy commissioner inserted a more precise statement or modified the tone from unquestioning applause of BCBSM's plan to neutrality, the deputy commissioner resolved the four central issues framed by the commissioner as follows:

Regarding the question whether the plan met the requirements of Minn.Stat. § 62C.09 to adjust operations to correct the excess surplus condition within a reasonable time, the deputy commissioner struck the ALJ's finding that the plan corrected the excess surplus in a reasonable time and substituted his own conclusion that "[W]hile [BCBSM] proposes admirable goals in the Amended Plan, [BCBSM] fails to correct its excess surplus status because it retains control of the excess surplus funds." He explained that Minn.Stat. § 62C.09 does not provide for the creation of supplemental reserves for any programs or initiatives as contemplated by the BCBSM plan, and in fact Minn. Stat. § 62C.10 (2000) "provides that any amounts that [BCBSM] invests in corporations whose business is the arrangement for, management of, or provision of health care services * * * shall be added to the minimum and maximum reserve requirements." He concluded that designation of the surplus funds to the 20 year "Tobacco Cessation Pharmacy Reserve" and "Tobacco Cessation and Other Health Risk Behavior" programs would not correct the excess within a reasonable time because the excess funds would remain under the control of BCBSM. In reaching this conclusion, he considered and rejected the assertion in the amended consent order that the "Proposed Plan faithfully discharges [BCBSM's] obligation to adjust its operations to correct its excess surplus within a reasonable time pursuant to the requirements of Minn.Stat. § 62C.09 (1998)," observing that "[a]n unequivocal statement will not suffice where evidence to support it has not been introduced."

Next, based on his conclusion that past, present and future subscribers would not be well served by the plan and that the ALJ did not consider the impact on past subscribers, the deputy commissioner struck the ALJ's conclusion that the BCBSM plan is fair and equitable to subscribers. First, he noted that the plan "ignores the increased premium costs borne by past fully-insured group subscribers" and that the legislative history of Minn.Stat. § 62C.09 indicates that excess surplus "should trigger a rate review leading to an adjustment of premium rates," which would normally lower premiums for substantially the same group as the one that paid the premiums that led to the surplus condition. He noted that according to BCBSM testimony, the majority of those who paid higher premiums due to the costs incurred by those made ill by smoking are no longer BCBSM members and would not benefit from future programs.

The deputy commissioner concluded that the plan "is neither fair nor equitable to its present and future subscribers because it dissipates tobacco settlement funds on duplicative programs and on goods and services of uncertain value." He found support for the conclusion that the plan is not fair to present and future subscribers in the BCBSM testimony that BCBSM did not anticipate any long-term savings from the "Member Health Awareness Program" and that both the "Member Health Awareness" and the "Tobacco Cessation and Other Risk Behavior" programs proposed to educate subscribers about similar topics. He concluded that the plan would duplicate current BCBSM initiatives for its subscribers [10] as well as state programs that already devote more than $1.1 billion to health prevention efforts targeted to assist Minnesotans to stop smoking and lead healthier lives, and suggested that donations of the surplus to existing state programs would avoid duplication of administrative costs and would be a better use of the funds.

In discussing the need to address the fairness of the plan to past subscribers, the deputy commissioner noted:

> legislative history indicates that [an excess surplus] should trigger a rate review leading to an adjustment of premium rates. Because the surplus is normally calculated every year, any subsequent reduction in premium rates implemented to correct an excess surplus would confer an immediate financial benefit on substantially the same subscriber population that paid the premiums that contributed to the excess surplus status. This process provides a fair and equitable adjustment of operations to correct the excess surplus: the subscribers who paid high premiums receive the direct benefit of reduced premiums.

He observed that the typical remedy in excess surplus circumstances was the adjustment of premiums, taking into account the interest of past as well as present subscribers as the only way to address the fact that the past subscriber population paid the premiums that contributed to the excess. He concluded that the plan would not be fair in "these unusual circumstances" because the settlement recovered by BCBSM represented its damages for 20 years of payment of claims for tobacco-related illnesses and the current group of subscribers is substantially different from those who actually experienced the increased premiums.

The deputy commissioner concluded that there was insufficient evidence that the plan would not pose a risk of disruption to the stability of the health insurance market, that rebates would be fair to subscribers because they would return the excess surplus to the subscribers who paid high premiums, and that BCBSM failed to adequately consider the feasibility of rebates.

In rejecting the ALJ's conclusion that the BCBSM plan would not adversely impact the regulation and orderly operation of the insurance and health industries in Minnesota, the deputy commissioner noted that "nothing in the Amended Consent Order purports to limit the effect on the insurance market of the goods and services which will be offered to present and future [BCBSM] subscribers." The deputy commissioner cited the comments submitted in evidence by the attorney general and the chamber of commerce that providing millions of dollars in pharmaceutical benefits, free gifts, education and counseling to subscribers without raising premiums, would be a strong incentive for future subscribers to join BCBSM and would disrupt the highly concentrated Minnesota health care market. He further noted that if other plans chose to compete they would have to charge higher premiums to offer similar

---

**10.** The deputy commissioner cited information not in the record that he developed through research on the internet in concluding that the plan would duplicate current BCBSM initiatives.

benefits, resulting in higher premiums for all consumers. He criticized the BCBSM plan for its reservation of the discretion to change the program details at any time and its failure to make a concrete commitment to a specific set of goals.

Finally, the deputy commissioner rejected the ALJ's conclusion that the BCBSM plan is in the public interest of the citizens of Minnesota on the basis of his concerns about the long-term control of the excess surplus funds by BCBSM management, his conclusion that BCBSM maintaining control of the surplus funds would inhibit the ability of the commissioner to accurately assess BCBSM's financial condition, and his concerns about the destabilizing effect the plan might have on the insurance and health industries in Minnesota. He again criticized the plan for squandering the settlement funds on duplicative programs and suggested that donations to existing institutions and programs would provide the greatest value to the largest number of people and would avoid the problems inherent in the plan.

### III.

On certiorari, the court of appeals reversed and remanded for approval and implementation of the BCBSM plan. The court held that the deputy commissioner's rejection of the plan was arbitrary and capricious, not supported by substantial evidence in the record and affected by errors of law and that the deputy commissioner failed to articulate reasons or provide evidentiary support for rejecting the ALJ's findings. It held that the deputy commissioner failed to accord the "burdens of deference" the court believed should be attributed to the ALJ's finding and views of agency experts. The court noted that because Minn.Stat. § 62C.09 contemplates sanctions for improper surplus status, the deputy commissioner had the burden of

proving noncompliance and that those who objected to the plan had to overcome a "prima facie" showing of compliance of BCBSM's plan.

The court criticized the deputy commissioner's finding that rebates would be a reasonable alternative and his failure to consider BCBSM's arguments against rebates. It held that the findings that the proposed programs are duplicative and of uncertain value ignored the testimony presented regarding coordination with MPAAT and the evidence of health care savings presented. The court ruled the deputy commissioner's stated concerns about financial oversight and market disruption were unfounded because department advocates testified that their concerns were addressed by the provisions agreed to in the amended consent order.

■■■ An appellate court may reverse or modify an administrative decision if substantial rights of the petitioners have been prejudiced by administrative findings, inferences, conclusions or decisions that are unsupported by substantial evidence in view of the entire record, or arbitrary and capricious, *see* Minn.Stat. § 14.69 (2000), but the court must also recognize the "need for exercising judicial restraint and for restricting judicial functions to a narrow area of responsibility lest (the court) substitute its judgment for that of the agency." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977) (citation omitted). It must be guided in its review by the principle that the agency's conclusions are not arbitrary and capricious so long as a "rational connection between the facts found and the choice made" has been articulated. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).[11]

We disagree with the holding of the court of appeals that the deputy commis-

**11.** Minnesota law is consistent with federal law with respect to this principle. *See Brown v. Wells,* 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970) ("Where there is room for two opinions on the matter, such action is not 'arbitrary and capricious' even though it may be believed that an erroneous conclusion has been reached.").

sioner's denial of approval of the plan was arbitrary and capricious, unsupported by substantial evidence and affected by errors of law, that the deputy commissioner owed "burdens of deference" to the ALJ and agency experts, that the commissioner had the burden of proving noncompliance and its conclusion that BCBSM's plan was prima facie in compliance with section 62C.09.

When reviewing agency decisions we "adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co.*, 256 N.W.2d at 824. The agency decision-maker is presumed to have the expertise necessary to decide technical matters within the scope of the agency's authority, *In re Special Instruction & Servs. for Pautz*, 295 N.W.2d 635, 637 (Minn.1980), and judicial deference, rooted in the separation of powers doctrine,[12] is extended to an agency decision-maker in the interpretation of statutes that the agency is charged with administering and enforcing. *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn.1979). We defer to an agency's conclusions regarding conflicts in testimony, the weight given to expert testimony and the inferences to be drawn from testimony. *See Quinn Distrib. Co. v. Quast Transfer, Inc.*, 288 Minn. 442, 448, 181 N.W.2d 696, 700 (1970).

The standard of review is not heightened where the final decision of the agency decision-maker differs from the recommendation of the ALJ. *See Hymanson v. City of St. Paul*, 329 N.W.2d 324, 326–27 (Minn.1983) (noting that "the agency is not bound by the findings and recommendations of the hearing examiner [and] * * * the relationship differs from that of

an appellate court reviewing a lower court's findings of fact: an agency could make new findings and decide contrary to the hearing examiner's recommendation."). Rejection of the ALJ's recommendations without explanation however, may suggest that the agency exercised its will rather than its judgment and was therefore arbitrary and capricious. *Markwardt v. State, Water Res. Bd.*, 254 N.W.2d 371, 374–75 (Minn.1977).

As to the court of appeal's holding that the deputy commissioner owes "significant deference" to the ALJ and judicial deference for the application of the deputy commissioner's expertise is applied "only to the extent it is evident on review that this separate expertise exists," the amended consent order clearly stated that it did not constrain the deputy commissioner's decision making authority. We require the agency decision-maker to weigh all of the evidence presented and come to an independent decision and contrary to the court of appeals' conclusion, the agency decision-maker owes no deference to any party in an administrative proceeding, nor to the findings, conclusions, or recommendations of the ALJ. We therefore reverse the court of appeals' ruling that deference should be accorded the recommendations of the ALJ and the evidence presented by agency advocates.

We also reverse the court of appeals' ruling that BCBSM made a prima facie showing "that the plan met the prescribed criteria" and that the deputy commissioner had the burden of proving that the plan did not comply with Minn.Stat. § 62C.09 or the commissioner-created criteria for its approval. The rule applies here that "[t]he party proposing that certain action be taken must prove the facts at issue * * * unless the substantive law provides a different burden," Minn. R.

---

12. *See Reserve Mining Co.*, 256 N.W.2d at 824 ("We have consistently viewed with disfavor statutes which specify trials de novo and which attempt to confer original jurisdiction on trial courts over policy matters which are the responsibility of the legislative and executive branches. * * * We have repeatedly called attention to the danger of eroding the barriers which guarantee the separation of powers.").

1400.7300, subp. 5 (1999),[13] because submission of the plan by BCBSM was a proposal that the department take an action requested by BCBSM. We therefore reverse the court of appeals as to its assignment of burden of proof.

## IV.

■ Our guiding principle is that if the ruling by the agency decision-maker is supported by substantial evidence, it must be affirmed. We adopted the following principles in the context of reviewing an agency decision in *Reserve Mining Co. v. Herbst,* 256 N.W.2d at 825:

> "1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference [is to be accorded] to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety."

We consider the quantity and quality of evidence on the four issues in light of these principles. *See Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 324, 329 (Minn.1983).

i. Does the plan meet the requirement of Minn.Stat. 62C.09, subd. 4 that operations be adjusted to correct the excess surplus condition within a reasonable time?

■ The deputy commissioner's conclusion that the plan fails to correct the excess surplus within a reasonable period of time is based on his dissatisfaction with BCBSM's continued control over BCBSM's surplus funds. He explained that use of the excess surplus to fund 20 year programs run by BCBSM did not satisfy the statutory requirement to reduce or eliminate the excess surplus within

a reasonable time period because it allowed BCBSM to maintain control over the funds for 20 years by designating it as a funding source for new programs. He also criticized BCBSM for failing to provide sufficient detail regarding when the excess surplus would be corrected.

The deputy commissioner's finding regarding the lack of statutory authority for BCBSM to correct its surplus by creating additional health care programs that remain under its control is accorded substantial deference because it reflects the technical expertise of the agency with regard to the interpretation of a statute under which it exercises its duties and powers to regulate the reserve status of a nonprofit health service plan corporation. *See Manufactured Hous. Inst. v. Pettersen,* 347 N.W.2d 238, 242 (Minn.1984) (according deference to agency interpretation of statute it is charged with administering). Further, his reasoning referenced the parts of the record he evaluated in coming to his decision, was consistent with comments in evidence by the attorney general and the chamber of commerce and was supported by substantial evidence.

We hold that the conclusions of the deputy commissioner as to the effectiveness of the plan in failing to correct the excess surplus within a reasonable period of time are supported by substantial evidence and are not arbitrary or capricious.

ii. Is the plan fair and equitable to BCBSM subscribers?

■ The court of appeals criticized the deputy commissioner's conclusion that the plan is not fair to subscribers on the basis that it was not within the deputy commissioner's authority to consider the plan's fairness to past subscribers or suggest that BCBSM return the tobacco settlement proceeds to subscribers in the form of premium rebates.

---

**13.** The parties make no argument that the substantive law provides a different burden.

*See* Minn.Stat. § 62C.09.

■ The legislature has vested broad authority in the commissioner to approve rates, provide oversight of BCBSM subscription charges and contracts, *see* Minn. Stat. § 62C.15, subds. 2 and 4 (2000), and oversee the reasonableness of BCBSM premiums in relation to costs, reserves, and surplus. *See* Minn.Stat. § 62C.15, subd. 1. As Minn.Stat. § 62C.09, subd. 4 requires the approval of a corrective action plan by the commissioner but does not prescribe a particular method of correcting excess surplus, the commissioner's broad oversight includes the authority "to promote a wider, more economical and timely availability of * * * health services for the people of Minnesota" and to "advance public health and the art and science of medical and health care within the state * * *." Minn.Stat. § 62C.01, subd. 2. The deputy commissioner observed that rebates would be an appropriate method of correcting the surplus condition based on his conclusion that the legislative intent in providing for the monitoring of excess surplus under section 62C.09, subdivision 4 is protection of consumers from unfair insurance premiums. His conclusion is based on his reasoning that the statutory scheme requires the regular monitoring of excess surplus, and a resulting premium adjustment typically benefits a substantially similar group of subscribers as the one that paid the inflated premium. The statutory goals of maintaining the surplus corridor, avoiding unfair costs to insurance consumers, advancing health and the general welfare, and maintaining the stability of the insurance and health industries in Minnesota clearly are sufficiently broad to permit consideration of a rebate.

■ The court of appeals erred in ruling that the deputy commissioner's finding that rebates might be more practical was unsupported by substantial evidence. The deputy commissioner cited several concerns that would be addressed by a rebate but not by the plan: the plan was duplicative of other programs and of uncertain value, starting new tobacco cessation programs would squander funds in unnecessary startup and administrative expenses, and the legislative intent expressed in Minn.Stat. ch. 62C and considerations of fairness require that the benefit of the settlement proceeds inure to the subscribers who actually paid the premiums reflecting the increased expense of caring for the tobacco-related illness. Indeed the ALJ acknowledged the feasibility of such a program: "The record indicates that a rebate proposal raises practical and equitable problems. Nonetheless, it does appear that [BCBSM] would be able to locate a large number of past subscribers were it required to do so." [14]

■ While we express no opinion regarding the appropriateness of rebates, the commissioner's broad oversight responsibility for premium adjustment to assure compliance with reserve requirements clearly provides the deputy commissioner authority to suggest that BCBSM had not fully explored alternatives to its plan and that other alternatives might be more practical, including rebates.

14. The ALJ further commented that "locating only those past subscribers who are readily ascertained, would reduce the cost of a rebate program. It seems clear that a rebate program could be proposed by [BCBSM] and could be approved by the Commissioner."

The court of appeals characterized the deputy commissioner's statements regarding rebates as an attempt to "dictate a special addition to a worthy plan that meets the aims of the statute." *See* Minn.Stat. § 62C.09. The deputy commissioner's statement that "[i]t would be fair and equitable for any [BCBSM] plan to include a refund of some portion of the settlement to the groups who paid the higher premiums during the period that formed the basis for the damages model [used to calculate the damages owed in BCBSM's complaint against the tobacco companies]" appears to be an observation only, not a dictate of what must be in the plan. However, the deputy commissioner also stated: "The only way to remain true to the [legislative intent of chapter 62C] would be to direct such a premium adjustment benefit to the fully-insured groups who paid higher premiums during the experience period used by [BCBSM] in its damages model."

The court of appeals also erred in concluding that there was no substantial evidence in the record to support the deputy commissioner's finding that programs in the BCBSM plan were duplicative and of uncertain value. The deputy commissioner sharply criticized the fact that BCBSM did not anticipate any long-term savings from the $80 million Member Health Awareness component of the plan and that the fitness and nutrition health education materials that would be distributed by the Member Health Awareness Program were duplicative of the fitness and nutrition health activities that would be covered by the Tobacco Cessation and Other Health Risk Behavior Program. These conclusions were based on materials submitted by BCBSM and arguments made in public comments submitted by the attorney general and the chamber of commerce and were supported by substantial evidence. The deputy commissioner went on to conclude that the plan would be duplicative of other state programs utilizing tobacco litigation settlement proceeds to assist Minnesotans to stop smoking. In reaching this conclusion, the deputy commissioner first cited the $102 million Cessation Account which will be used to offer smoking cessation opportunities to Minnesota smokers and the $100 million National Research Account which will provide research grants for projects relating to the elimination of tobacco use by children and other tobacco control programs that are being administered by Minnesota Partnership for Action Against Tobacco (MPAAT). Although BCBSM presented testimony that it would seek to avoid duplication of the MPAAT programs, the deputy commissioner observed that the creation of BCBSM programs to accomplish the same goals as the MPAAT programs would result in needless expenditure for startup and administrative costs such as overhead, business planning and establishing relationships with those already active in the field.

Further, the deputy commissioner referenced two endowments established by the Minnesota Legislature in 1999 utilizing a portion of the first installment of the state's $6.1 billion tobacco litigation settlement to fund a $590 million Tobacco Prevention and Local Public Health Endowment that will focus on tobacco prevention efforts targeting youth and provide funds to community health boards and local public health entities for initiatives aimed at tobacco use prevention and other health-related prevention efforts for youths, and a $378 million Medical Education Endowment for clinical training of medical care professionals in Minnesota, including training in how to treat patients for tobacco use cessation. He concluded that with such substantial dollar amounts already dedicated to establishing tobacco cessation programs for Minnesotans, it appears that programs proposed under BCBSM's plan would duplicate many of the efforts already underway in the state.

It would hardly be consistent with the responsibility of the commissioner to consider the plan in light of the public interest to ignore the existence of other state-run tobacco cessation and health promotion programs, especially given the magnitude of the current state programs. We hold that the deputy commissioner's finding that the BCBSM plan was duplicative of other state programs was well within his authority, was amply supported by substantial evidence in the record and was not arbitrary and capricious.

The deputy commissioner additionally concluded that the plan would duplicate BCBSM's own health education programs already in place for BCBSM members and cited a recent BCBSM publication mailed to members and BCBSM member web sites that provide health education regarding nutrition, fitness, tobacco cessation and other topics outlined in the plan. To properly consider such evidence however, an agency decision-maker must take official notice of information outside the record, notify the parties in writing, and provide them an opportunity to re-

spond. Minn.Stat. § 14.60, subd. 4. The member publication and web site pages cited by the deputy commissioner in the memorandum accompanying his final decision were not in the record and the deputy commissioner's consideration of these materials did not meet the requirements of section 14.60, subdivision 4. Although intervenor Johnson submitted a portion of a BCBSM member newsletter that described health promotion programs for members, it was not cited by the deputy commissioner and was insufficient evidence to conclude that the BCBSM plan was duplicative of current BCBSM member education initiatives. Therefore we conclude that there was insufficient evidence in the record to support the determination of the deputy commissioner that the plan duplicates existing BCBSM plans.

Despite our conclusion that the deputy commissioner overstepped his authority by consulting materials outside the record, we find that his conclusion that the plan is not fair and equitable to BCBSM subscribers is supported by his analysis of the impact of the plan on past subscribers, his finding that other methods of reducing the excess surplus might be more practical than the plan, and his concerns regarding the uncertain value and duplicative nature of the proposed programs. We hold that the deputy commissioner's determination that the plan is not fair and equitable to BCBSM subscribers is supported by substantial evidence and is not arbitrary and capricious.

 iii. What impact will the plan have on the regulation and orderly operation of the insurance and health industries in Minnesota?

The court of appeals concluded that there was insufficient evidence to support the deputy commissioner's conclusion that the plan would disrupt the orderly operation of the health and insurance industries in Minnesota. We disagree. The deputy commissioner rejected the ALJ's finding that the plan will have limited impact on the marketplace and substituted his own finding that the plan does not provide adequate assurance that the impact would be limited. He explained that his concern stemmed from a lack of mechanisms to protect the market from the impact of the goods and services which would be offered by BCBSM through the plan, quoting comments submitted by the attorney general and the chamber of commerce as to the competitive advantage BCBSM will gain through these "future dividends" and the potential barrier to new market entry. He noted that the plan would allow BCBSM to provide millions of dollars in pharmaceutical benefits, free gifts, education and counseling to subscribers without raising premiums. Citing comments in evidence submitted by the attorney general and the chamber of commerce,[15] the deputy commissioner concluded that the member health awareness program merchandise and other program benefits would be a strong incentive for future subscribers to join BCBSM, thereby disrupting the highly concentrated Minnesota health care market. He further noted that other plans choosing to offer similar benefits, in order to maintain market share, would have to charge higher premiums to offer similar benefits, resulting in higher premiums for consumers. He criticized the BCBSM plan for reserving the discretion to change the program

**15.** Respondent objects to the deputy commissioner's reference to a letter dated December 18, 1998 submitted by the Minnesota Department of Health relating to this point. The letter in question was submitted to the department during the prehearing comment period rather than to the ALJ and thus was not made part of the record. While the deputy commissioner's consideration of a letter not in evidence was improper because of failure to comply with Minn.Stat. § 14.60, subd. 4, the impact was likely minor as it was cited as support for the type of general knowledge, "experience, technical competence, and specialized knowledge" the decision-maker may utilize to evaluate the record. *See Kollmorgen v. State Bd. of Medical Examiners*, 416 N.W.2d 485, 488 (Minn.App.1988) (quoting Minn.Stat. § .14.60, subd. 4).

details at any time and its failure to make a concrete commitment to a specific set of goals. He clearly stated his concerns regarding disruption to the health and insurance industries, continued BCBSM control over the excess surplus, and the impact of the plan on subscribers.

We hold that the deputy commissioner's conclusion that the plan would have an adverse impact on the orderly operation of the health insurance industry in Minnesota was supported by substantial evidence and was not arbitrary and capricious.

iv. Is the plan in the public interest of the citizens of Minnesota?

■■■ The court of appeals reversed the deputy commissioner's conclusion that the plan was not in the public interest of the citizens of Minnesota on the basis that it was supported by insufficient evidence and was arbitrary and capricious. The deputy commissioner concluded that diversion of excess surplus funds into separate accounts to fund programs run by BCBSM was unauthorized by chapter 62C and allowing such accounts would circumvent the maximum surplus limit set by the legislature and impede the ability of the commissioner to assess the nonprofit's financial condition. Based on his earlier conclusion that the BCBSM plan was duplicative of other programs, he observed that it was also not in the public interest because the BCBSM plan would "squander significant sums on unnecessary startup costs and duplicative programs" and it would be more cost effective to donate the funds to existing programs.

Finally, the deputy commissioner cited his concerns regarding the potential disruption of the health and insurance industry in Minnesota resulting from the health-related merchandise and other benefits that would be distributed to BCBSM members under the plan. He characterized the Minnesota health insurance market as highly competitive and concentrated, and concluded that approval of the plan would afford BCBSM a sustained competitive advantage with the potential to destabilize

health premiums in the Minnesota insurance market. The deputy commissioner's observations regarding the potential impact on the Minnesota health insurance industry and the public interest in stable insurance premiums reflects the technical expertise developed by the agency in the exercise of legislatively delegated duties and powers to protect the public interest and regulate the Minnesota insurance market and is accorded substantial deference. In light of the deputy commissioner's conclusion that the plan did not comply with chapter 62C and his concerns regarding BCBSM's continued control over the surplus and the plan's impact on the orderly operation of the health and insurance industries in Minnesota, we hold that the deputy commissioner's determination that the plan is not in the public interest of the citizens of Minnesota was supported by substantial evidence and was not arbitrary and capricious.

## V.

Although there is insufficient evidence in the record to uphold the deputy commissioner's conclusion that the plan would be duplicative of current BCBSM programs, we conclude that the deputy commissioner's determinations that the BCBSM plan did not meet the requirements of Minn. Stat. § 62C.09 to correct the excess surplus condition within a reasonable time, the plan is not fair and equitable to BCBSM subscribers, it could adversely impact the regulation and orderly operation of the insurance and health industries in Minnesota and it was not in the public interest of the citizens of Minnesota is supported by substantial evidence and is not arbitrary or capricious. Our conclusion that the deputy commissioner's decision was reasoned and sufficiently supported by the evidence of record is based upon well established rules relating to agency proceedings, but it does not reflect any particular view as to the substance or merits of BCBSM's plan to reduce its excess surplus.

We reverse and remand to the Department of Commerce for further consideration of a revised plan to be submitted by BCBSM for approval by the commissioner in accordance with Minn.Stat. § 62C.09 and this opinion.

Reversed.

PAGE, R. ANDERSON, GILBERT, JJ., took no part in the consideration or decision of this case.