*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2155**

City of Hinckley,
Relator,

vs.

North Pine Area Hospital District,
Respondent.

**Filed August 24, 2015
Affirmed
Stauber, Judge**

North Pine Area Hospital District

Kevin A. Hofstad, Ledin & Hofstad, Ltd., Pine City, Minnesota (for relator)

Matthew H. Hanka, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, Minnesota (for respondent)

Considered and decided by Rodenberg, Presiding Judge; Stauber, Judge; and Bjorkman, Judge.

## UNPUBLISHED OPINION

**STAUBER**, Judge

In this certiorari appeal, relator-city challenges the respondent hospital district's denial of its petition to detach itself from the hospital district as arbitrary and capricious. We affirm.

## FACTS

Respondent North Pine Area Hospital District (the hospital district) was formed in 1989, when 17 municipalities created a hospital district as permitted under Minn. Stat. § 447.31-37 (1988). Relator City of Hinckley (the city) was the first municipality to pass the necessary resolution to create the hospital district. At the time, the hospital located in nearby Sandstone was the nearest hospital for residents of the city. Since that time, five other hospitals were built or expanded in a 50-mile area around the city, including Burnett Medical Center in Grantsburg, Wisconsin, First Light in Mora, Mercy Hospital in Moose Lake, Fairview Hospital in Wyoming, and Cambridge Medical Center in Cambridge, providing other hospital options for Hinckley residents.

The hospital district is run by a board (the board) consisting of representatives of all 17 municipalities. The hospital district levies a tax on each participating municipality. These taxes vary based on taxable property in each municipality. In a sample of the taxes paid by various Hinckley city council members, each person pays between 2.3-2.34% of his property taxes to the hospital district; the city pays 16.92% of the total hospital district levy. Since 1996, the board has leased the hospital and associated nursing home and clinic facilities in Sandstone to Essentia Health. Under its lease, Essentia is required to present an annual capital-improvements budget to the board, which certifies the amount to the Pine County auditor. The board has used its bonding authority to finance improvements to the facilities, and Essentia pays rent that is sufficient to cover all bonding-debt service.

2

In 2012, the board and Essentia began planning to construct a new facility, which would provide the same services as the original hospital but with significant modernization.  In October 2013, the city filed a petition for detachment from the hospital district.  The city alleged that there had been a substantial change in circumstances since establishment of the hospital district, including: (1) a majority of the city's population live closer to other hospitals; (2) city residents favor detachment; (3) the hospital district no longer operates a hospital, just an emergency room, and therefore residents should not have to support it with a tax levy; (4) the city is concerned about the continuing existence of the nursing home and the incurrence of additional debt; (5) city residents pay a disproportionate amount relative to other members of the hospital district; and (6) city residents utilize the facility at lower rates than those in other members of the district.  The city further alleged that its share of the hospital district levy is disproportionately high, particularly in light of hospital usage by its citizens and that, were it permitted to detach, the remaining municipalities in the hospital district would see their average levies per taxable parcel rise by only $2.54.  On the other hand, the city feared that its share of the levy would rise dramatically if the new hospital facility is not successful and the hospital-district members have to pay more because of the bonds issued by the board for the new hospital.

In accordance with Minn. Stat. § 447.38, subds. 1, 2 (2014), the board established a "universal detachment proceeding policy."  This policy outlined the procedures the board would follow in evaluating the detachment petition; the procedures included alternative dispute resolution, followed by public hearings.  The board also specified a

3

timeline and a standard of review. An alternative dispute resolution attempt was unsuccessful, and, therefore, the board held two public hearings with a neutral party acting as moderator. At the first hearing on July 29, 2014, the city's administrator, Kyle Morell, read a prepared statement summarizing the city's grounds for detachment. Other comments at the meeting were generally supportive of the hospital but critical of the board as disorganized and unprofessional. At the second public hearing, Morell was the only speaker, and he repeated his earlier remarks.

The board voted to deny the city's petition to detach, and, on October 28, 2014, issued a written order rejecting the city's detachment petition. The board's order addressed the questions outlined in the detachment proceeding policy and was supported by 80 pages of exhibits. In this certiorari appeal, the city challenges that decision.

## D E C I S I O N

Minn. Stat. § 447.38, subd. 2, permits a municipality included in a hospital district to petition the hospital district board for detachment from the hospital district. This statute provides that the board shall determine whether detachment should be granted. No particular procedure is set forth in the statute but in accordance with Op. Att'y Gen. 1001-K (May 11, 1978), "the board may adopt its own reasonable procedures," guided by the Administrative Procedures Act. Previously this court approved the following criteria for a board considering a petition for detachment:

> 1.    What benefit or harm will there be to [the municipality] or the hospital district if the petition is granted?
> 2.    What facts have been presented to show the uniqueness of [the municipality] in comparison to other governmental units comprising the district?

4

3. Has there been a substantial change in circumstances from the time of formation [of the hospital district] to the present?

. . .

4. How much validity is there to reasons given for detachment?

*Twp. of Ottertail v. Perham Hosp. Dist.*, 438 N.W.2d 412, 414 (Minn. App. 1989). Here, the board adopted similar standards. In addition, the board set a timeline for the procedure, encouraged alternative dispute resolution, authorized discovery, and mandated a minimum of two public hearings and procedures for those hearings and, thus, established appropriate procedures. *See id.* at 413.

Our review of a hospital district board's decision is deferential: we will defer to the board's decision if it was within its jurisdiction, not mistaken as to law, not arbitrary, capricious, unreasonable or oppressive, and reasonably supported by the evidence. *Id.* We will not substitute our judgment for that of the decision-making body. *City of New Brighton v. Metro. Council*, 306 Minn. 425, 430, 237 N.W.2d 620, 624 (1975). The city maintains that the board's decision was arbitrary and capricious.

Using its adopted detachment procedure, the board analyzed the city's request as follows:

## I.    Relative benefit/harm to the city and the hospital district

The board found that (1) city residents pay 2-3% of their total tax liability per taxable parcel to the hospital district, which is approximately 16% of the total amount levied; (2) "this amount [is not] unreasonable for the totality of benefits that [city] residents enjoy as a result of the Sandstone facility"; and (3) if the city was permitted to

5

detach from the district, it would likely lead other members to seek detachment, leading to a disorderly dissolution of the hospital district. The board further found that city residents were second only to Sandstone residents as employees of the hospital district and that city residents were heavy users of the facility, either first or second in the district in using ambulance services, outpatient clinic visits, and emergency-room and urgent-care visits. The board concluded that because the city is the largest in the district and its residents heavily use the hospital district services, it would be unfair to other members to permit the city to pay less than its full share, and, if the city detached, it might be impossible to build the new medical facility. Finally, the board concluded that the city benefits from the hospital-district facility and detachment would harm the district and its health-care operations. This court reviewed similar considerations in *Twp. of Ottertail*, and concluded that the district had properly denied detachment. 438 N.W.2d at 415.

## II. Uniqueness of city compared to other district members

The city argued that its position is unique because its residents are closer to other hospitals outside the district, and that they pay a disproportionate share of the levy relative to other hospital district members, while receiving less benefit.

But the board found that the city's residents "highly utilize the hospital services, and gain huge economic benefits from the medical facilities located in Sandstone." The board cited payroll earnings of $1,282,541 paid to people with the city area code, second only to Sandstone residents. In a sample of tax levies of the city's council members, the yearly payments ranged between $24.11 and $57.57, which the board described as "a fair trade-off for the economic benefits and health care services consumed by [city]

6

residents." The board also found that the total city levy had fallen from $43,519 in 2005 to $37,828 in 2013. Further, if the city were permitted to detach, its residents would still use the facility's services and would continue to be employed by the facility. The city's status was not unique as compared to that of other members of the district in a way that would weigh in favor of detachment; in fact, the board opined that the city is unique "in that its citizens highly utilize the District's health care services and gain huge economic benefits from the Sandstone facility."

### III. Change in circumstances

The city alleged that the hospital district is no longer needed because of easy access to other facilities, but the board found that many of the same circumstances that led to creation of the district still exist. In 1989, the district had been created because it appeared the Sandstone hospital would have to close for lack of funding and because it was difficult to recruit physicians. At that time, hospitals in both Mora and Moose Lake were also supported by hospital districts. In its original resolution establishing the district, the city stated, "Sandstone Area Hospital and Nursing Home will have difficulty continuing in existence as an economically viable institution unless it has the powers of a hospital district."

The board found that currently the hospital district "is playing an instrumental role in facilitating the development of an integrated care delivery model that brings together multiple health care related entities for the purpose of increasing the efficiency of services delivered, which will in turn increase the breadth of services available to residents of Pine County." Without the city as a member, the hospital district might not

7

be able to compete with surrounding hospitals, including Mora and Moose Lake, which are still supported by hospital districts. Finally, the board found that city residents continue to "highly utilize health care services and gain huge economic benefits from the Sandstone facility" and commented "[t]hat has not changed so as to justify detachment."

Similar considerations supported the hospital district's decision in *Twp. of Ottertail*. *See* 438 N.W.2d at 415 (concluding that board's finding that although some citizens may go to another hospital, evidence showed that they heavily used the facility at issue). The board's findings suggest a continuing need for the facility and that circumstances are similar to those existing when the district was created.

## IV.  Credible and valid evidence in support of detachment

The board found "that there is no probative evidence of financial hardship, unique circumstances, or changed circumstances to justify granting the petition." Many of the city's complaints involved dissatisfaction with the board, including lack of financial oversight, failure to timely produce budgets or lack of planning as to the new facility. The detailed exhibits provided by the board, which are attached to its decision, suggest that the board is run more professionally than it formerly was. Similar allegations of imprudence were made in *Twp. of Ottertail* and were dismissed by that hospital district. *Id.* at 416.

The city argues that the board "based its decision on data and documents which were never presented into the record." The two public hearings did not include formal acceptance of documents into the record. But the materials relied on by the board and attached to its decision were provided to the city in advance of the second public hearing.

8

The city argues that the board offered no evidence because there had not been a formal introduction of documents into the record, citing *In re Application of N. States Power Co.*, 440 N.W.2d 138, 140-41 (Minn. App. 1989), in which this court reversed a Minnesota Public Utilities Commission decision because the administrative law judge (ALJ) relied on a cost study from a prior proceeding that had not been submitted in the contested case hearing record. This court affirmed that "[n]o factual information or evidence shall be considered in the determination of a [contested] case unless it is part of the record." *Id.* at 140 (quotation omitted).

But in *Town of Forest Lake v. Minn. Mun. Bd.*, 497 N.W.2d 289 (Minn. App. 1993), *review denied* (Minn. Apr. 29, 1993), this court rejected an argument that the board had improperly relied on evidence not submitted in the record, when the town had received copies of the submissions before the hearing and had not objected to its submission or its contents, and it was clear that the board would rely on the submission in order to reach a decision. *Id.* at 290-91. Here, the city received the materials the board relied on before the second hearing and made no comment on, or objection to, those materials.

This matter also differs in critical ways from *In re Application of N. States Power*. That matter involved a contested case hearing before an ALJ. The peculiar nature of a hospital district detachment has the board representing the district and acting as the decisionmaker, and empowers the board to create procedures to guide its decision. *See* Minn. Stat. § 447.38; *Twp. of Ottertail*, 438 N.W.2d at 414. In Op. Att'y Gen. 1001-K, the attorney general advised that "[a]bsent specific statutory directions [as to hearing

9

procedure], the board may adopt its own reasonable procedures.  In so doing, the board *may* wish to be guided by appropriate provisions of the Administrative Procedures Act." (Emphasis added.)  This permissive language suggests that the board need not strictly adhere to those procedures.  The Administrative Procedures Act itself states that "[a]ll evidence . . . in the possession of the agency of which it desires to avail itself *or* which is offered into evidence by a party to a contested case proceeding, shall be made a part of the hearing record."  Minn. Stat. § 14.60, subd. 2 (2014) (emphasis added).

The board applied and examined the proper criteria in making its decision. "[C]onclusions are not arbitrary or capricious so long as a rational connection between the facts found and the choice made has been articulated."  *In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn. 2001) (quotation omitted).  Because of the deferential standard of review, we will not substitute our judgment for that of the board.  *Id.*

**Affirmed.**