COLSON EQUIPMENT, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 81–1825.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 9, 1982.

Decided March 12, 1982.

Rehearing Denied April 20, 1982.

Robert J. Mignin, J. Stephen Poor, Chicago, Ill., for petitioner, Colson Equipment, Inc.; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Christine Weiner, Atty., N.L.R.B., Washington, D.C., for respondent.

Before LAY, Chief Judge, STEPHENSON, Circuit Judge, and OVERTON,* District Judge.

LAY, Chief Judge.

This case is before this court on the petition of Colson Equipment, Inc. (Colson) to review and set aside a final decision and order of the National Labor Relations Board (Board) and the Board's cross-application for enforcement. The administrative law judge (ALJ) dismissed the Union's complaint. The Board reversed the ALJ's credibility findings and found that Colson threatened and interrogated employees in violation of section 8(a)(1). The Board also ruled that Colson violated section 8(a)(5). Colson alleges that there was not substantial evidence on the record as a whole to support either the section 8(a)(1) or section 8(a)(5) violations. It contends that the Board erred in overturning the ALJ's findings on the section 8(a)(1) violation since the relevant findings turn on the credibility of the witnesses. It also urges that the finding of a section 8(a)(5) violation is in error because the evidence shows the Union had become defunct and no collective bargaining contract existed.

We deny enforcement of the Board's decisions as to the section 8(a)(1) violation; however, we enforce the Board's finding that the company failed to bargain with the Union in violation of section 8(a)(5).

*Facts.*

The essential facts regarding the parties' collective bargaining relationship are not in dispute. On February 26, 1974, District No. 9, International Association of Machinists and Aerospace Workers (Union) was certified as the bargaining representative of Colson's production and maintenance employees. Subsequently, the parties signed a contract that was effective from December 9, 1974, through December 8, 1977, and was automatically renewable from year to year unless either party gave notice to terminate. During the initial three-year term, the Union's business agent visited the Colson plant several times; there was a shop steward, and employees signed dues-checkoff authorization cards. Starting in 1977, however, the Union became less active in administering the contract. In early 1977, the two remaining dues-paying employees canceled their checkoff authorizations. In early December 1977, Colson gave the Union written notice that the contract would

* William Ray Overton, United States District Judge for the Eastern District of Arkansas, sitting by designation.

be automatically renewed and that wage increases would be put into effect unilaterally. The Union failed to respond to Colson's notice.

In 1978, there was no union steward, no dues were deducted, and no grievances were filed. In December 1978, Colson unilaterally increased wages and changed fringe benefits. The Union made no request to bargain with Colson about the changes. In 1979, there still was no union steward and no dues were deducted. In April 1979, however, a grievance was filed about the discharge of an employee. After an exchange of letters between the Union and Colson, Colson denied the grievance and refused to meet with the Union or supply it with any other information regarding the employee or the reason for terminating him. In early summer 1979, the Union's business agent, Glass, met four times with employees at their request to solicit new members.

The Union was inactive for the first six months of 1980. In June and July, however, Glass met with employees and distributed membership applications and dues-checkoff authorization cards. On July 28, 1980, the Union submitted authorization cards for 55 employees to Colson. Four of these 55 employees subsequently sent Colson notes requesting that their authorization cards be disregarded. On August 21, 1980, Colson's general manager, Williams, informed employees that Colson would not honor the authorization cards submitted by the Union. On the same day, Williams wrote the Union advising it that Colson would neither recognize nor bargain with the Union. On August 29, 1980, the Union designated an employee to serve as shop committeeman and submitted seven additional authorization cards. Subsequently, the Union sent the company by certified mail a letter dated October 3, 1980, which served notice of its desire to terminate the contract. Colson refused receipt of that letter. Colson also refused to receive the Union's letters of October 10 and 31, 1980, requesting information concerning unit employees and filing two grievances, respectively. In December 1980, Colson unilaterally increased wages and benefits.

The factual basis of the section 8(a)(1) complaint is disputed. According to testimony not fully credited by the ALJ, during the period of renewed union activity three employees were questioned about the Union. On June 22, 1980, supervisor Forbus asked employee Crews whether the Union would "go over" this time. Forbus allegedly told Crews that he had found Crews' authorization card but that he had not turned it in because Crews would be fired and that initially the company would "crack down" on safety rules if the Union were successful, but that safety enforcement would then return to normal. Employee Stateler testified that in a July 1980 telephone conversation then plant manager Downey asked him whether he had joined the Union and whether he had been forced to do so. Employee Brandon testified that Downey asked him "if he [Brandon] was strictly Union" and why people were mad. Downey also told Brandon that no employee would lose his job because of union support. Employee Stateler also testified that in September 1980, supervisor Clayton stated, "If the Union came in they would move the plant." Clayton admitted having a conversation with Stateler and said that Stateler told him, "We've got the Company by the ass. We have got so many charges against them and so many grievances and everything that they would have to recognize the Union." Clayton responded, "They always have the choice of closing up and moving."

*Standard of Review.*

Where the Board's findings of fact are contrary to the ALJ's factual conclusions this court will review more critically the Board's findings. *Acme Products, Inc. v. NLRB*, 389 F.2d 104, 106 (8th Cir. 1968); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977). The Board's evidence supporting a conclusion contrary to the ALJ's findings "must be stronger than would be required in cases where the findings are accepted, . . . ." *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967). Thus, evidence in the record

which, when taken alone, may amount to "substantial evidence" will often be insufficient when the trial examiner has, on the basis of the witnesses' demeanor, made credibility findings contrary to the Board's position. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Royal Typewriter Co. v. NLRB,* 533 F.2d 1030, 1042 n.12 (8th Cir. 1976); *Penasquitos Village,* 565 F.2d at 1078.

*Section 8(a)(1) Violation.*

The ALJ specifically stated that his findings were based on his observation of "witness demeanor." He also declared that he was unable to credit the testimony of employee Crews and that he found Stateler's testimony "vague and unconvincing." Brandon's testimony was not discredited; however, Downey's statements to Brandon were found not to be coercive.

The Board not only reversed the decision of the ALJ, but in doing so it made credibility findings contrary to those of the ALJ. We, therefore, give less deference to the conclusion of the Board. As the Fifth Circuit noted in *Ward v. NLRB,* 462 F.2d 8 (5th Cir. 1972):

> [W]hen the Board second-guesses the Examiner and gives credence to testimony which he has found—either expressly or by implication—to be inherently untrustworthy, the substantiality of that evidence is tenuous at best.

462 F.2d at 12.

■ On review, we find that the Board's conclusion that Colson threatened or interrogated Brandon, Stateler, and Crews is not supported by substantial evidence on the record as a whole. The Board's decision is therefore set aside.

*Refusal to Bargain.*

There is little doubt that a contract was in effect in 1980. The collective bargaining agreement, which was effective through December 8, 1977, contained an automatic renewal clause, and the parties stipulated that the required notice of termination was not given by either party until October 1980. Indeed, Williams wrote in a letter dated August 21, 1980, to Glass that "we have every intention of complying with our obligations under both our collective bargaining agreement with your Union and under the National Labor Relations Act, . . . ."

■ In *Osteopathic Hospital Founders Association v. NLRB,* 618 F.2d 633 (10th Cir. 1980) it was observed:

> When a collective bargaining agreement is in effect between the parties, an incumbent union enjoys a virtually irrebuttable presumption of majority status as long as the agreement is entitled to "contract bar" protection. *Pioneer Inn Associates v. N.L.R.B.,* 578 F.2d 835 (9th Cir. 1978); *Hexton Furniture Co.,* 111 N.L.R.B. 342 (1955). Accordingly, "during this time, an employer cannot use doubt about a union's majority as a defense to a refusal-to-bargain charge." *N.L.R.B. v. Burns Security Services,* 406 U.S. 272, 290 n.12, 92 S.Ct. 1571, 1583 n.12, 32 L.Ed.2d 61 (1972); *see also Pioneer Inn Associates.* This rule applies even though a majority of the employees in the unit have freely abandoned the union. *N.L.R.B. v. Marcus Trucking Co.,* 286 F.2d 583 (2d Cir. 1961).

618 F.2d at 638.[1]

■ Board precedent establishes an exception to the contract bar rule: a collective bargaining agreement does not constitute a bar to the representation petition where the recognized unit is "defunct." *Pioneer Inn Assoc. v. NLRB,* 578 F.2d 835, 839 (9th Cir. 1978), *enforcing Pioneer Inn Assoc.,* 228 NLRB 1263, 1264 (1977). A union is defunct when it is "unwilling or unable" to

---

1. Generally, under the contract bar rule the Board refuses to conduct decertification elections—whether requested by the employer, employees, or another union—during the life of the contract. Thus, an employer is prevented from avoiding his contract obligations by petitioning for a decertification election. Similarly, an employer is prevented from refusing to adhere to the contract terms by professing a doubt of majority status. *See Pioneer Inn Assoc. v. NLRB,* 578 F.2d 835, 838 (9th Cir. 1978).

represent the employees at the time its status is questioned. *Pioneer Inn Assoc.*, 578 F.2d at 839; *Loree Footwear Corp.*, 197 NLRB 360 (1972).

The ALJ concluded that the Union was defunct. Although it accepted the factual findings of the ALJ, the Board reached a different conclusion. The Board did find that the Union was relatively inactive in fulfilling its representative duties from 1977 to 1980, but it determined that the Union did not abandon them. It found little evidence that employees had ever sought the Union's help without receiving it; in fact, the Union did act on the one grievance filed in the three-year period. The Union held several meetings in 1979 and 1980, submitted dues deduction cards, and appointed a shop committeeman. Although the Union was dormant for some of this period, it had "resumed its role" by the time Colson questioned its status. *See Pioneer Inn Assoc.*, 578 F.2d at 839. We find the Board's conclusion supported by substantial evidence on the record as a whole. Accordingly, under the contract bar rules, Colson is precluded from raising an alleged good faith doubt as a defense to the Board's finding that it unlawfully refused to bargain.

Even if there were no contract in effect the Union enjoys a rebuttable presumption of majority status. The presumption is:

> normally rebuttable by a showing that the union no longer commands a majority, or by the employer's production of sufficient evidence to cast serious doubts thereon, in which event the presumption then loses its force and the General Counsel must come forward with the evidence that on the refusal to bargain date the union in fact did represent a majority of employees in the appropriate unit, ... or that the refusal to bargain was not predicated upon a good faith and reasonably grounded doubt of the union's continued majority status.

*National Cash Register Co. v. NLRB*, 494 F.2d 189, 194 (8th Cir. 1974), *quoted in National Car Rental System, Inc. v. NLRB*, 594 F.2d 1203, 1205 (8th Cir. 1979).

*See NLRB v. North Am. Mfg. Co.*, 563 F.2d 894, 896 (8th Cir. 1977). Assuming, arguendo, that Colson produced sufficient evidence to cast serious doubts on the Union's majority status, the Board has shown that the refusal to bargain was not predicated upon a good faith and reasonably grounded doubt of the Union's majority status. Indeed, in its letter of August 21, 1980, refusing to honor the dues-checkoff authorization cards, the company, rather than charging union inactivity, suggested that the Union had been too actively obtaining cards through misrepresentation or coercion. The company did not question the Union's status until the Union demonstrated a resurgence of activity.

We enforce that part of the Board's order concerning Colson's refusal to bargain. We do not enforce that portion of the order requiring Colson to cease and desist from unlawfully threatening and interrogating employees.