**In the Matter of the Occupational License of Kathy HUTCHINSON.**

**No. C0–88–2493.**

Court of Appeals of Minnesota.

May 23, 1989.

Review Denied Aug. 9, 1989.

the Commission's decision: (1) was made upon unlawful procedure, and (2) was not supported by substantial evidence. We disagree and affirm the Commission's decision. .

## FACTS

Appellant Kathy Hutchinson is a horse trainer who received her license from the Minnesota Racing Commission in 1985. She raced a number of horses at the Minnesota race track, Canterbury Downs, in 1985 and 1986. During the summer of 1986, appellant was administering a drug called propranolol to several of her horses. The drug is legal, and was prescribed by a veterinarian. However, Minnesota law prohibits the administration of propranolol and other medications to a horse within 48 hours of a race. *See* Minn.Stat. § 240.24, subd. 1 (1988); Minn.R. 7890.0110. Trainers use propranolol to control and reduce rapid heart rates and cardiac output induced by intense training. The drug is metabolized quickly by horses and is transformed into various water soluble products eliminated by the kidneys.

On August 7, 1986, appellant raced three horses, named Blopo's Nite, Dr. Francis, and Grey Writer, at Canterbury Downs. On August 7, 1986, Grey Writer placed second at the Canterbury race track. Immediately after the races, urine samples were taken from the three horses.

On August 21, the urine samples were analyzed at the Minnesota Racing Analytical Laboratory of the University of Minnesota, College of Veterinary Medicine. The tests showed that all three horses had received propranolol. The urine samples of Blopo's Nite and Dr. Francis showed traces only of a derivative drug, 4–hydroxy propranolol. Grey Writer's urine sample, however, tested positive for 4–hydroxy propranolol and its parent drug, propranolol. After determining that the test for the parent drug was positive, the Canterbury officials asked and received permission to conduct a search of appellant's stables. That search produced five bottles of Inderal L.A., a trade name for a long-acting form of propranolol.

Robert J. Hennessey, Andrew J. Mitchell, Larkin, Hoffman, Daly & Lindgren Ltd., Bloomington, for Kathy Hutchinson.

Hubert H. Humphrey, III, Atty. Gen., Mary B. Magnuson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Racing Com'n.

Heard, considered and decided by SHORT, P.J., and RANDALL and KALITOWSKI, JJ.

## OPINION

SHORT, Judge.

Kathy Hutchinson initially appealed a decision of the Minnesota Racing Commission. At appellant's request, the case was transferred to the district court for the taking of additional evidence on alleged procedural irregularities. *See* Minn.Stat. § 14.68 (1988). The case is now before us following the district court's decision against appellant. Pursuant to Minn.R. Civ.App.P. 103.03(g), appellant alleges that

On August 27, appellant was served with a notice of hearing before the Board of Stewards at Canterbury Downs. Following that hearing, appellant was suspended for 30 days and fined $500.00. The Board also referred the matter to the Minnesota Racing Commission for additional action. During the term of her suspension, appellant was ordered off all race track grounds under the jurisdiction of the Commission, and all horses owned or trained by her were declared ineligible to enter races. The purse that Grey Writer had won on August 7 was ordered forfeited and redistributed. Appellant filed a notice of appeal with the Commission, together with a request for a stay of the suspension.

A panel of the Racing Commission stayed all action of the Board of Stewards pending its resolution of the appeal following a contested case hearing. The case was then heard before an administrative law judge (ALJ) of the Office of Administrative Hearings. Appellant submitted into evidence various medication log books maintained by her. The entries in those books indicated that no propranolol had been administered to any of the horses within 48 hours before the August 7 race. Appellant also testified that she had not medicated the horses in question within 48 hours of the race.

The Commission offered the testimony of the Director of the Ohio State Racing Commission Laboratory. Based upon his knowledge and upon tests he had conducted on other horses, this expert concluded that Grey Writer had been medicated less than 48 hours before the race began. This testimony was corroborated by testimony of the Director of the Minnesota Racing Laboratory.[1]

The ALJ found that the Commission had failed to submit substantial evidence proving that appellant administered propranolol to any of the three horses within 48 hours of the August 7 race. The ALJ based his recommendation on appellant's testimony and her medication logs. He also found that the scientific research about the metabolism rate of propranolol was inconclusive.[2]

After the ALJ had issued his recommendation, the matter was heard by the Minnesota Racing Commission pursuant to Minn. Stat. § 14.61 (1988). The Commission heard arguments from the counsel for both parties, and then deliberated on the case in a closed session. The Commission announced its decision publicly, before the parties and their attorneys.

The Commission adopted findings and conclusions, in part contrary to those the ALJ had recommended. The Commission reasoned that the test results were reliable, that the Commission's expert testimony was supportive, and that appellant's history of past violations adversely affected her credibility.[3] The Commission therefore reimposed the suspension and fine.

Alleging various procedural irregularities in the Commission's proceedings, appellant sought a writ of certiorari to have the Commission's decision reviewed by this court. This court issued an order transferring the matter to the Hennepin County district court for the taking of testimony relevant to the alleged procedural irregu-

---

**1.** Because these tests revealed that traces of 4-hydroxy propranolol (the derivative drug found in the urine samples of Blopo's Nite and Dr. Francis) may still be present in a horse's urine more than 48 hours after its administration, the Commission based its case against Hutchinson only upon positive test results for Grey Writer. The Commission subsequently affirmed the ALJ's dismissal of all charges based on medication of the other two horses.

**2.** The legislature has subsequently acted to clarify the law regarding medication of race horses. The amendment simplifies the standard of proof by eliminating the need to determine when the prohibited drug was administered. *See* Minn. Stat. § 240.24, subd. 2 (1988). The new statute requires the Commission's rules to provide "that no horse participating in a race shall carry in its body any substance foreign to the natural horse." Minn.Stat. § 240.24, subd. 1. The rules have also been so amended. *See* 1987 Minn. Laws ch. 69, § 4 and Minn.R. 7890.0110 (1987).

**3.** Appellant previously had been suspended and had received censures in California, Washington, and Minnesota for violating state rules pertaining to the medication of horses. She was also on probation in Minnesota during 1986 for having violated medication rules prior to this incident.

larities. The trial court then ruled against appellant on all of her procedural arguments.

## ISSUES

I. Was the Commission's decision made upon unlawful procedure?

II. Was the Commission's decision supported by substantial evidence in view of the entire record?

## ANALYSIS

### I.

■ Where the trial court reviewing an agency decision makes independent factual determinations and otherwise acts as a court of first impression, this court applies the "clearly erroneous" standard of review. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 823 (Minn.1977); *see also Sierra Club v. Marsh,* 769 F.2d 868, 872 (1st Cir.1985). Where, on the other hand, the trial court is itself acting as an appellate tribunal with respect to the agency decision, this court will independently review the agency's record. *Reserve Mining,* 256 N.W.2d at 824; *see also Minnesota Power & Light Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 324, 329 (Minn.1983). In the present case, the trial court based its conclusions as to the procedural issues raised by appellant on legal rather than factual considerations. This court conducts a de novo review of such issues, and is not bound by the legal conclusions of the trial court or of the agency itself. *See No Power Line, Inc. v. Minnesota Envornmental Quality Council,* 262 N.W.2d 312, 320 (Minn.1977).

A. The Commission's failure to file exceptions is not fatal.

■ Appellant argues that because the Commission staff failed to file exceptions to the ALJ's report, the Commission was required to adopt the report in its entirety. This argument is contrary to law. *Surf & Sand Nursing Home v. Department of Human Services,* 422 N.W.2d 513, 519–20 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. June 23, 1988). An ALJ's report to the Commission is only a recommendation, and neither binds the parties nor limits the independent factfinding power of the Commission. There is thus no basis to conclude that the Commission is obligated to adopt the ALJ's recommendations when a party fails to submit written exceptions.

B. The Commission did not violate the Open Meeting Law.

Appellant next contends that the Commission's decision to close the deliberative portion of the proceedings violates the Minnesota Open Meeting Law. That law states in relevant part:

> Except as otherwise expressly provided by statute, all meetings * * * of any state agency, board, commission or department when required or permitted by law to transact public business in a meeting * * * shall be open to the public. * * * *This section shall not apply to any state agency, board, or commission when exercising quasi-judicial functions involving disciplinary proceedings.*

Minn.Stat. § 471.705, subd. 1 (1988) (emphasis added). Appellant does not dispute that the Commission is a state agency, or that it was exercising a quasi-judicial function. She argues, however, that the "disciplinary proceedings" contemplated by the act pertain only to employee discipline matters, and not to proceedings involving licensees.

■ The Open Meeting Law requires that all meetings of state agencies be open to the public, subject only to a few explicitly-stated exceptions. *St. Cloud Newspapers, Inc. v. District 742 Community Schools,* 332 N.W.2d 1, 5 (Minn.1983). Disciplinary proceedings are among the "rare and carefully restrained exception[s]" specified by the legislature. *Id.* Minnesota courts have not distinguished between disciplinary proceedings involving employees and those involving licensees. *See Annandale Advocate v. City of Annandale,* 435 N.W.2d 24, 29–30 (Minn.1989); *St. Cloud Newspapers, Inc.,* 332 N.W.2d at 5. Appellant argues, however, that the legislative history of the open meeting law requires

that such a distinction be recognized by the courts.

A statute whose meaning is plain must be given effect without further scrutiny. *Tuma v. Commissioner of Economic Security*, 386 N.W.2d 702, 706 (Minn. 1986). The Minnesota Supreme Court has held, for example, that the word "meeting" as used in section 471.705 is not ambiguous, but includes all official deliberations and formal actions. *St. Cloud Newspapers, Inc.*, 332 N.W.2d at 8. Similarly, the proceedings involving the status of appellant's license were disciplinary in nature, and fall under the plain meaning of the phrase "disciplinary proceedings."

Further, the legislative history of the exception clause does not indicate a legislative intent to distinguish between employees and licensees. In fact, that history suggests the contrary: that the legislature considered but rejected an amendment making such a distinction. 1973 Journal of the Senate, 2153; 1973 Journal of the House, 3792. The legislative history thus indicates that the legislature did not intend to distinguish between disciplinary proceedings involving employees and those involving licensees.

We note, however, that the Commission's decision to exclude appellant and her attorney from the deliberations does not further the purpose of this exception. The exception is in part intended to protect the privacy rights of the person who is subject to discipline. While this goal is furthered by excluding the public and media from the proceedings, it is not enhanced by preventing the subject or the subject's attorney from being present at the proceedings. Because the statute does not distinguish between those who are subject to discipline and other members of the public, we decline to make this distinction judicially.

C. The Commission's review of the record did not violate appellant's due process rights.

Appellant next argues that the Commission's decision was not based on the record because some of the panel members admitted through interrogatories that they did not read the entire transcript of the testimony taken before the ALJ and did not review all of the exhibits in evidence. Minnesota law requires that the Commission's decision be based on the record. Minn.Stat. § 14.62, subd. 1 (1988). Appellant has failed to show that any evidence not in the record was considered, and thus has no basis for this argument.

Moreover, appellant does not dispute that each of the panel members heard the oral argument, read the briefs and appendices, and carefully reviewed the findings of the ALJ. One of the panel members also read the entire transcript and examined all of the exhibits. An assistant attorney general authorized to assist the Commission likewise reviewed the entire transcript, the exhibits and the briefs before rendering his advice to the panel. Appellant also had an opportunity at oral argument to bring to the panel's attention anything not included in the briefs and appendices. Under these circumstances, the Commission's review of the record was more than adequate, and did not violate appellant's rights of due process. *See Application of Lecy*, 304 N.W.2d 894, 898–99 (Minn.1981); *Urban Council on Mobility v. Minnesota Department of Natural Resources*, 289 N.W.2d 729, 736 (Minn.1980).

## II.

Agency decisions are presumed to be correct by reviewing courts, and will be reversed only when they reflect an error of law or when the findings are arbitrary and capricious or unsupported by substantial evidence. *Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1980). A reviewing court must uphold an agency's decision if the record, considered in its entirety, contains substantial evidence supporting the decision. *Urban Counsel on Mobility*, 289 N.W.2d at 733. In cases where the agency's conclusions differ from those of the hearing examiner regarding witness credibility, the reviewing court will more critically review the agency's findings. *Colson Equipment, Inc. v. National Labor Relations Board*, 673 F.2d 221, 223

(8th Cir.1982); *Townsend v. Nelson*, 242 N.W.2d 607, 608–09 (Minn.1976); *see Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951).

The critical fact determination in this case is whether appellant administered propranolol to Grey Writer within 48 hours of the August 7 race. The ALJ answered that question in the negative because (a) appellant testified that she had not administered the drug within 48 hours and (b) appellant's medication logs indicated that no medication had been administered on August 5, 6 or 7. The expert testimony that the positive test results indicate the drug must have been administered within the prohibited time frame was given no significant weight by the ALJ because the use of propranolol/Inderal is "so new and so unusual in horses."

The function of an expert is to assist the factfinder in reaching correct conclusions from facts in evidence. *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 154 (Minn. 1982). In the present case, the undisputed facts in evidence established the presence of propranolol in Grey Writer's body immediately after the race. The expert testimony was intended to explain the presence of that drug to the factfinder. While the ALJ was not persuaded by the expert testimony, he did not find the experts lacking in credibility.

The Commission rejected the ALJ's finding that the expert study was unreliable because it was so new, reasoning that "[t]he study * * * is the kind * * * which is and must be relied upon by state regulators confronted with potential abuse of literally hundreds of thousands of pharmacological substances." The Commission also credited expert testimony that differences in sex or weight between Grey Writer and the horses used in the experiment would not render the study unreliable.

■ It is within the peculiar expertise of the agency to evaluate the weight to be accorded expert evidence, and we will not substitute our judgment for that of the agency. Our review must focus on the record and appellant's burden is to establish that the agency's decision is not supported by the record. The scientific evidence and expert testimony tended to show that appellant had medicated Grey Writer less than 48 hours before the race. The Commission's decision was properly based on the inferences it drew from all of the documentary and testimonial evidence before it. Because the decision is supported by substantial evidence, the agency's decision is affirmed.

■ Appellant also argues that the Commission's decision should be reversed because it is arbitrary and capricious. *See* Minn.Stat. § 14.69(f) (1988). An agency decision is arbitrary and capricious when it represents the agency's will and not its judgment. *Markwardt v. State, Water Resources Board*, 254 N.W.2d 371, 374 (Minn. 1977). Because the Commission followed proper procedures and its decision was based on substantial evidence, the Commission's decision was not arbitrary or capricious.

### DECISION

The hearing before the Racing Commission did not violate appellant's constitutional or procedural rights. The Commission's decision is supported by substantial evidence on the record as a whole.

Affirmed.