*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1854**

In the Matter of
the Findings of Maltreatment and Disqualification of R. M. M.,
Appellant,

vs.

State of Minnesota,
Department of Health,
Respondent.

**Filed July 5, 2016
Affirmed
Reyes, Judge**

Ramsey County District Court
File No. 62CV151464

Tara Reese Duginske, Adam G. Chandler, Briggs and Morgan, P.A., Minneapolis, Minnesota (for appellant)

Lori Swanson, Attorney General, Timothy S. Christensen, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Cleary, Chief Judge; and Johnson, Judge.

## U N P U B L I S H E D   O P I N I O N

**REYES**, Judge

Appellant challenges the commissioner of health's order affirming respondent's finding that appellant committed maltreatment of a vulnerable adult and the

commissioner's refusal to set aside his disqualification. Appellant also asserts that the commissioner's determination is unsupported by substantial evidence and is arbitrary and capricious. We affirm.

**FACTS**

Appellant R.M.M., a certified nursing assistant, worked as a resident assistant (RA) at Presbyterian Homes of Arden Hills (Presbyterian Homes). Appellant was a caretaker for many patients, including J.E., an elderly woman with osteoporosis and other ailments. Presbyterian Homes developed a care plan for J.E., which required her to eat all meals in the cafeteria. The care plan also required J.E. to be transferred from her bed to a wheelchair using a mechanical Golvo lift,[1] which needed two trained employees to operate. The care plan was communicated to Presbyterian Homes's employees through a summary referred to as "my best day" plan (J.E.'s care plan).[2]

Prior to Presbyterian Homes residents' lunch hour, appellant was required to get the residents for whom he was responsible to the cafeteria. At approximately 11:45 a.m. on January 20, 2014, appellant used a one-person pivot transfer[3] to move J.E. from her bed to the wheelchair. During the one-person pivot transfer, J.E.'s leg was injured. J.E. was taken to the hospital and diagnosed with a broken leg. She died two days later.

---

[1] A Golvo lift is equipment used for transfers consisting of a sling and mechanical movements that provides a total assist for the transfer.

[2] A copy of each patient's "my best day" plan is kept in the resident's bathroom and at the nurse's desk.

[3] A pivot transfer is performed when an employee places a cloth belt around the resident's waist, the resident bears some weight on his or her feet, and the employee turns or pivots the resident into a new position, e.g., from their bed to a wheelchair.

2

Immediately after the incident, appellant contacted his supervising nurse, L.P., about J.E.'s injury. Presbyterian Homes conducted an internal investigation approximately 25 minutes after the incident occurred and interviewed appellant. Appellant told the internal investigator that he transferred J.E. using a pivot transfer because she was smaller, he needed to get her up for lunch, and to save time. Respondent department of health (DOH) also conducted an investigation approximately three weeks after the incident, and determined that appellant maltreated a vulnerable adult by neglect. Appellant told respondent that he transferred J.E. in this manner to get her to lunch, because he was pressed for time, and he had done it before without incident. Respondent informed appellant that he was disqualified from working in Minnesota licensed facilities based on the finding that the maltreatment was serious. Appellant requested reconsideration on both the determination of maltreatment and disqualification, which respondent denied. Respondent informed appellant that he had a right to a hearing and to administrative reconsideration.

Appellant requested an administrative hearing, and both matters were heard in October 2014 before a human-services judge (HSJ). During the hearing, appellant argued in the alternative that he transferred J.E. using a pivot transfer because of her recurring problems with pneumonia. The HSJ issued proposed findings and conclusions, recommended that the maltreatment determination and the disqualification be affirmed. Both parties filed exceptions to the HSJ's recommendation. The commissioner of health issued a final order adopting the HSJ's report with various amendments and affirmed the determination of maltreatment and disqualification. Appellant subsequently appealed the

3

commissioner's decision to the district court, which affirmed the commissioner. This appeal follows.

## D E C I S I O N

When "the [district] court is itself acting as an appellate tribunal with respect to the agency decision, this court will independently review the agency's record." *In re Hutchinson*, 440 N.W.2d 171, 175 (Minn. App. 1989) (quotations omitted), *review denied* (Minn. Aug. 9, 1989). "[I]f the ruling by the agency decision-maker is supported by substantial evidence, it must be affirmed." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 279 (Minn. 2001). Under the substantial-evidence test, a reviewing court evaluates "the evidence relied upon by the agency in view of the entire record as submitted. If an administrative agency engages in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cable Commc'ns Bd. Nor-West. Cable Commc'ns P'ship*, 356 N.W.2d 658, 668-69 (Minn. 1984) (citations omitted). "[T]he burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety." *In re Application of Minn. Power*, 838 N.W.2d 747, 760 (Minn. 2013) (quoting *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn. 1977)).

**I.** **Substantial evidence supports the determination that the incident was not the result of therapeutic-conduct exception pursuant to Minn. Stat. § 626.5572, subd. 17(a)(2) (2014).**

Appellant argues that the commissioner's maltreatment determination is not supported by substantial evidence because appellant's actions fall within the therapeutic-conduct exception and therefore do not constitute neglect. We disagree.

Substantial evidence is (1) relevant evidence that a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence, some evidence, or any evidence; and (3) the evidence considered in its entirety. *Cable Commc'ns Bd.*, 356 N.W.2d at 668. The appellate court will "consider the agency's expertise and special knowledge when reviewing an agency's application of a regulation when application of the regulation is primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented." *In re Cities of Annandale and Maple Lake NPDES/SDS Permit*, 731 N.W.2d 502, 515 n.9 (Minn. 2007) (quotation omitted). Moreover, appellate courts "defer to an agency's conclusions regarding conflicts in testimony," the weight given, and the inferences drawn from such testimony. *See BCBSM*, 624 N.W.2d at 278.

The parties do not dispute that J.E. was protected under the statute as a vulnerable adult (VA) or that appellant was a caregiver. Minn. Stat. § 626.5572, subds. 4, 21(a)(1) (2014). Under Minn. Stat. § 626.5572, subd. 17(a) (2014), a caregiver neglects a VA by failing or omitting to supply her with:

> care or services including but not limited to, food, clothing, shelter, health care, or supervision which is:

> (1) reasonable and necessary to obtain or maintain the [VA's] physical or mental health or safety, considering the physical and mental capacity or dysfunction of the vulnerable adult; and
> (2) which is not the result of an accident or therapeutic conduct.

*Id.* "Therapeutic conduct" is defined as "the provision of the program services, health care, or other personal care services done in good faith in the interests of the vulnerable adult." Minn. Stat. § 626.5572, subd. 20 (2014).

In adopting the HSJ's findings and conclusions, the commissioner concluded, and the parties do not dispute that, appellant's actions were in good faith. But in failing to follow J.E.'s care plan, the commissioner concluded that appellant did not act in J.E.'s best interests. The commissioner also concluded that appellant acted in his own interest by taking a shortcut in transferring J.E. and that the incident was not "something gone wrong during the course of 'therapeutic conduct'" under Minn. Stat. § 626.5572, subds. 17(c)(5), 20 (2014).

The record supports the commissioner's conclusion that appellant's actions did not constitute therapeutic conduct because he did not act in J.E.'s best interests by failing to follow J.E.'s care plan, and he is not precluded from a determination of maltreatment by neglect. We defer to the DOH's expertise and special knowledge. *In re Annandale*, 731 N.W.2d at 515 n.9.

J.E.'s care plan required a two-person Golvo lift since December 2012, and this was also reflected in her most recent care plan in late November 2013. Appellant was on

6

notice about J.E.'s transfer status of a Golvo lift for over a year prior to the incident. J.E.'s care plan also directed her caretakers to take her to the dining room for all meals.

Presbyterian Homes required their staff to follow the resident's care plans, communicated this expectation to employees at the initial training, and included it as part of each employee's ongoing training. RAs were not to make their own assessments, and any perceived conflict among care-plan directives was to be resolved by contacting a supervising nurse. Appellant stated that he was aware that the resident's care plans were developed by the licensed staff at Presbyterian Homes and that he was required to follow its guidelines, including regulations, best practices, and "established policies, procedures[,] and practices." Moreover, DOH investigator S.R. testified that a VA's care plan is what is considered in the best interests of the VA because the care plan is based on individualized assessments.

Despite appellant's training and Presbyterian Homes' clear guidelines providing that RAs do not make their own assessments, appellant did so and failed to contact a supervising nurse for guidance. He also failed to request help from another trained employee to move J.E. Moreover, appellant acknowledged that J.E. could have arrived late to lunch or could have gotten out of bed later in the day using the prescribed Golvo lift, even if persons on the next shift got her out of bed. By failing to abide by J.E.'s care plan, appellant failed to act in her best interests. We conclude, as the commissioner did, that appellant's actions were done in his own best interests, not in J.E.'s best interests. Furthermore, appellant testified that he had used a pivot transfer, contrary to J.E.'s care plan, on other occasions. This is further evidence of multiple actions constituting

maltreatment for failure to follow J.E.'s care plan. As such, the evidence supports the commissioner's maltreatment and disqualification determination.

Appellant also argues that a violation of policy by itself does not demonstrate maltreatment by the caregiver and relies on two unpublished cases for support, *C.J.K. v. State, Dept. of Health*, C9-00-583, 2000 WL 1617815 (Minn. App. Oct. 31, 2000), *review denied* (Minn. Jan. 16, 2001), and *D.R.W. v. State, Dept. of Health*, C5-01-526, 2001 WL 1187092 (Minn. App. Oct. 9, 2001). But unpublished cases are not precedential. Minn. Stat. 480A.08, subd. 3 (2014). Moreover, those cases do not stand for the proposition for which they are cited.

Appellant further argues, for the first time on appeal to the district court and this court, that there should be a subjective standard when analyzing whether he was acting in the VA's best interests. The district court found that appellant's argument was "not consistent with the weight of appellate authority" under the therapeutic-conduct analysis. Caselaw supports the district court's application of the objective standard. *See J.R.B. v. Dep't of Human Servs*., 633 N.W.2d 33, 38 (Minn. App. 2001) (illustrating unavailability of therapeutic-conduct defense when J.R.B. observed significant change in resident's physical condition yet failed to contact the resident's physician contrary to rehabilitation home's policy, which was not in the patient's best interests), *review denied* (Minn. Oct. 24, 2001).

Finally, appellant argues that he acted in J.E.'s best interests by getting her out of bed to prevent pneumonia. Appellant did not argue that his reason for using the pivot transfer was to prevent pneumonia until the administrative hearing. And it was within the

8

commissioner's discretion to believe appellant's earlier accounts. *See In re Excess Surplus Status of Blue Cross Blue Shield of Minn.*, 624 N.W.2d at 278 (stating that we defer to the agency to resolve conflicting testimony). Additionally, the guidelines do not provide for an RA to make their own judgment regarding the resident's care plans. Rather, they require the RA to contact a supervising nurse whenever an RA has a question about a resident's care plan. Because appellant failed to follow J.E.'s care plan, he failed to act in her best interests, she was injured, and his conduct was not the consequence of "therapeutic conduct."

**II.     The commissioner considered mitigating factors.**

Appellant argues that the DOH "failed to conduct a sufficient investigation into mitigating factors regarding the January 20, 2014 incident" as required by Minn. Stat. § 626.557, subd. 9c(c)(2) (2014), and the commissioner's decision requires reversal because it is based upon that insufficiency. Appellant only challenges the DOH's requirement with regard to the second mitigating factor and specifically asserts that it did not sufficiently investigate the adequacy of the staffing levels at Presbyterian Homes. This argument is without merit.

Minn. Stat. § 626.557, subd. 9c(c) provides:

> When determining whether the facility or individual is the responsible party for substantiated maltreatment or whether both . . . are responsible for substantiated maltreatment, the lead investigative agency[4] shall consider at least the following mitigating factors: . . . .
> (2) the comparative responsibility between the facility, other caregivers, and requirements placed upon the employee,

---

[4] DOH in this case.

> including but not limited to. . . the adequacy of facility staffing levels . . . .

The commissioner found that, although the "staffing . . . over the lunch hour was tight," appellant was comparatively at fault. The commissioner determined that, while appellant discussed the staff that were present and absent, he failed to tell the investigator that "he thought there was inadequate staffing or that no one was available to help him." The commissioner also found that appellant "had adequate resources to safely transfer [J.E.] and, at least comparatively, that the facility was not at fault for his exercise of poor judgment in not calling on or waiting for those resources."

The evidence supports the commissioner's findings regarding the staffing at Presbyterian Homes. When appellant was initially interviewed by the investigators, he did not express concerns regarding inadequate staffing. He also did not state that staff was unavailable to help him transfer J.E. Even two weeks later, appellant's statement to DOH investigator S.R. was that he used the pivot transfer to save time based on his professional judgment, not because of inadequate staffing.

Nonetheless, S.R. inquired about the staffing levels at Presbyterian Homes, determined that they were normal, and addressed staffing in the mitigating factors portion of her report. S.R. testified that she "had no reason to believe that [the resident's daily needs] weren't being [addressed] prior to or after" the incident. Because the resident's daily needs were being addressed, S.R.'s determination that the staffing levels were "normal" is reasonable based on the evidence. It can also be inferred from the evidence that S.R.'s determination of "normal" is synonymous with "adequate." As such, the

commissioner's decision considered mitigating factors including the adequacy of the staffing levels.

**III.    The commissioner's findings and determinations were not arbitrary and capricious.**

Appellant argues that the commissioner's decision was arbitrary and capricious for the following reasons: (1) the commissioner failed to adequately consider the two conflicting directives in J.E.'s care plan; (2) the commissioner incorrectly determined that appellant was not acting in J.E.'s best interests; (3) one error cannot support a finding of maltreatment; and (4) because appellant's actions did not constitute maltreatment, the [commissioner's] disqualification determination is improper. Appellant, however, fails to provide legal support for his assertions.

"[A]n agency ruling is arbitrary and capricious if the agency (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006).

In adopting the HSJ's findings and conclusions, the commissioner found that "[n]othing in the circumstances created [a] dilemma" or conflict in J.E.'s care plan. The commissioner analyzed what appellant viewed as conflicts in J.E.'s care plan directives but ultimately found that appellant made a "personal" or "professional judgment" in using the pivot transfer, and appellant made no "effort to seek help with transferring the

11

VA." The commissioner further concluded that appellant did not act in J.E.'s best interests because he deviated from her care plan, and in doing so, appellant acted in his own interest "by taking a shortcut in transferring [J.E.]." The commissioner also found that appellant had previously transferred J.E. using a pivot transfer in violation of her care plan. Finally, the commissioner determined that "the [DOH] proved by a preponderance of the evidence that [a]ppellant maltreated a vulnerable adult" and affirmed the disqualification. The record supports the commissioner's findings and determinations and therefore is not arbitrary and capricious.

**IV.    The commissioner did not err in affirming the maltreatment and disqualification order or by not considering the theory of manifest injustice.**

Appellant argues that the commissioner's maltreatment finding and determinations results in a manifest injustice because of its harsh penalties and consequences and therefore should be reversed. But appellant failed to present this argument at either the administrative hearing or at the district court. We cannot consider issues not raised to the court below. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

**Affirmed**.

12