*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1084**

In the Appeal of Maren Erickson for Maltreatment of a Minor.

**Filed May 13, 2024
Affirmed
Ede, Judge**

Hennepin County District Court
File No. 27-CV-22-2290

Christa J. Groshek, Aaron J. Roy, Groshek Law, P.A., Minneapolis, Minnesota (for appellant Maren Erickson)

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services)

Amy K. Akbay, Minnesota Department of Human Services, St. Paul, Minnesota (for respondent Minnesota Department of Human Services)

Considered and decided by Larson, Presiding Judge; Reyes, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

Appellant-mother challenges a district court order affirming the final decision of the Commissioner of Human Services (the commissioner), which upheld a maltreatment determination by respondent Hennepin County Human Services (the agency). Because we conclude that substantial evidence supports the commissioner's decision, we affirm.

## FACTS

Appellant Maren Erickson (mother) has three children, including J.E. (daughter) and her older brother, T.E. (son). K.E. (father) shares joint legal custody of the children with mother. In early March 2020, Hennepin County Child Protection received an oral report about daughter, who was 15 years old at the time.

The reporter stated that daughter completed a needs assessment because of suicidal thoughts. At the end of the assessment, mother disclosed that sexual incidents had occurred between daughter and son. Mother said that the incidents began when daughter was in the second grade and continued until daughter was in the fourth grade.

According to the reporter, daughter stated that the abuse was "under the clothes" and that it began when she was in the second grade and continued until she was in the sixth grade. At the time of the oral report, son was an adult and was still living in mother's home with daughter and their younger sibling. Following the needs assessment, daughter was diagnosed with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder.

The day after the oral report, a child-protection investigator (the investigator) interviewed daughter at her high school. Daughter reported that the abuse started when she was six years old and continued until she was eleven. Daughter stated that son touched her body with his hands, but she denied that son displayed or used his genitals. Daughter said that most of the abuse occurred when she and son were alone at home together, but sometimes son would abuse her while mother and their younger sibling were sleeping.

The investigator consulted the school resource officer at daughter's school. The officer reported that, when he spoke with daughter the week before about her suicidal ideations, she told him that she had been abused but did not want to name the abuser. After speaking again with the officer, daughter agreed to complete a forensic interview at CornerHouse, an organization that conducts such interviews in child-trauma cases.

When the investigator informed mother that a forensic interview with daughter was scheduled, mother said she did not want daughter to be interviewed at CornerHouse. Mother informed the investigator that she reported the sexual abuse to child protection years ago, but child protection told her that they did not investigate sibling-on-sibling touching. Mother also stated that she took son to have a psychosexual evaluation and to engage in therapy after daughter reported the abuse to her.

A doctor reported to the investigator that, in 2016, he met with son and his family to conduct an initial diagnostic assessment. The doctor also stated that, when mother emailed him the day after the assessment and thanked him for the session, the doctor informed mother of the need to complete additional testing for a full psychosexual evaluation. But the doctor told the investigator that, following their email correspondence, he did not hear back from mother, even after the doctor sent mother a follow-up email. A manager of a mental-health clinic also reported to the investigator that, in 2016, both daughter and son had "only received approximately 2 sessions each of therapy."

When the investigator conducted an in-home interview with mother, mother disclosed that son admitted to placing either a pen or pencil, as well as an ice cube, inside daughter's buttocks. Mother reported that son told her that daughter was, at first, a willing

participant. Mother told the investigator that she disclosed the abuse to child protection, but child protection declined to take the report and advised her to seek out therapy for the children. Mother expressed that she wanted to focus on daughter receiving therapy for her depression and anxiety, and mother stated that daughter was on a waiting list for a partial-hospitalization program. In the underlying proceedings, mother conceded that she "was informed on March 11, 2020, that [son] would need to leave the home during the investigation."

When the investigator interviewed father, he stated that he was aware of the past abuse but unsure of how many times it had occurred. Father reported that he is a truck driver and only sees the children every other weekend. The investigator informed father that son needed to leave mother's home because an active criminal investigation of the matter had begun. Father agreed that son could come to stay at father's home.

Daughter was admitted to a partial-hospitalization program at the end of March 2020. Daughter presented with depressed mood and reported a history of sadness, hopelessness, irritability, and changes in her sleeping pattern.

Daughter completed a forensic interview at CornerHouse, without mother's knowledge, on April 9, 2020. In the interview, daughter revealed that son stuck pens, pencils, and his fingers into both her vagina and buttocks. Daughter said the abuse started when she was in the second grade and continued until she was in the sixth grade. Daughter recalled that the abuse would occur one to three times per week, at night or when she and son did not have adult supervision. Daughter also reported that son would hit her on the back and legs with a belt and would slap her in the face. Daughter stated that on one

occasion, son hit her with a bat. Daughter also said that son had told her that he would kill himself if she ever disclosed the abuse to mother.

Following the interview, daughter spent the weekend at father's residence. After daughter returned to individual therapy the following week, she shared that mother was not currently talking to her. Daughter believed that mother was upset with her for speaking with a detective. Daughter also "reported that [mother] [was] very upset with [daughter] and [was] 'verbally beating her up' and . . . telling [daughter] to just get over it." Daughter said "that the police were at the house at some point" and that they had stated that son "needed to leave the home." Daughter told her therapist that mother kept "defending her brother and continue[d] to let him stay in the house" and daughter expressed her frustration that mother was not requiring son to live outside the home. Daughter also stated that son had come "into her room with aggressive posturing, shut the door and said to her, 'Why are you ruining my life?'" In addition, son reportedly admonished daughter, yelling that she had "'screwed things up' with the family." On April 15, 2020, daughter's therapist noted that daughter was admitted to inpatient hospital care "due to increasing safety concerns including suicidal ideation with a plan." Daughter's therapist informed the investigator that daughter had "reported that she felt suicidal and didn't want to live anymore."

Son agreed to an interview with law enforcement on April 13, 2020. During the interview, son admitted to sexually abusing daughter. Son reported that the abuse began when daughter was six years old and would occur approximately once a week. Son revealed that he would take his anger out on daughter by hitting her on the buttocks with a belt. Son

5

admitted to sticking pencils into daughter's buttocks. Son denied ever using his fingers to penetrate daughter but recalled using an ice cube on one occasion. Son admitted that daughter would tell him to stop and that he was hurting her. Son reported that the abuse would typically "last approximately ten to fifteen minutes and [that daughter] would take her clothes off at his direction so he could hit her in the buttocks with a belt." When asked whether there should be cause for concern about his reoffending, son stated: "Everyone's capable."

The next day, mother's attorney contacted the investigator and reported that mother had been reaching out to people outside her home for places for son to stay, but options were limited by the COVID-19 pandemic. Mother's attorney said that mother had contacted her parents but represented that "they are in their seventies and . . . did not want [son] residing at their home" because of son's exposure to other people outside of their residence. Mother's attorney also stated that son's friends "declined him staying at their home due to the pandemic," and that son would have no choice but to live in father's truck because father was working as an "over-the-road truck driver."

The investigator informed mother's attorney that mother should reconsider having son stay in father's home because son was 18 years old. In the alternative, the investigator suggested that son reside in the lower level of mother's home, while the younger siblings remain in the upper level. The investigator "reiterated the importance of [son] not having any contact with his siblings while in the home."

After speaking with the investigator, mother's attorney sent a follow-up email, which reiterated mother's concerns about son living at father's house. The email explained

that mother did not believe it was an option for son to live at father's residence because son had never lived on his own, had "just turned 18[,] and [did] not have a car or money if he needed anything or to go anywhere." Mother's attorney asked the investigator to reconsider allowing mother to supervise contact between son and the other children because there were never any allegations between son and the younger sibling, and because the past abuse between son and daughter had occurred "over 5 years ago."

The investigator spoke to mother's attorney again on April 17, 2020, informing her that son needed to leave mother's home because the state was charging him with two counts of first-degree criminal sexual conduct. The investigator also informed mother's attorney that the agency was preparing to petition the district court for an order adjudicating daughter and her younger sibling as children in need of protection or services (CHIPS). On April 20, 2020, mother's attorney notified the agency that son had moved out. Mother's attorney informed the investigator that son would stay with a friend for a few days, and then move in with his grandparents. But the agency could not confirm that son had vacated mother's residence until the investigator spoke with his maternal grandmother on April 29, 2020.

The agency filed the CHIPS petition with the district court on April 27, 2020.[1] The agency later mailed mother written notice of its maltreatment determination, which was

---

[1] In October 2020, the district court dismissed the CHIPS petition after mother filed a "Court Notification / Request for Order" stating that the probation department in son's delinquency matter would be monitoring compliance with an agreement that prohibited contact between daughter and son, unless contact was requested by daughter or if daughter's therapist approved contact.

dated April 30, 2020. In the notice, the agency informed mother that it had received a report that her "child/children may have been sexually abused and threatened [with] sexual abuse by [a] sibling" and that there had been "neglect" and a "failure to protect [from] serious endangerment by [mother] and [father]." The notice reported that the agency had completed an investigation and that a preponderance of the evidence supported a finding of sexual abuse, threatened sexual abuse, and neglect.

Mother requested reconsideration of the maltreatment determination. The agency responded to mother's request for reconsideration by stating that it was adhering to its original decision. Pursuant to Minnesota Statutes section 256.045, subdivision 3 (Supp. 2023), mother obtained a fair hearing, at which she was represented by counsel. A human services judge (HSJ) heard testimony from the investigator, mother, and the children's maternal grandmother.

After the fair hearing, the HSJ filed findings of fact, conclusions of law, and a recommendation for an order affirming the agency's maltreatment determination. The HSJ determined that "the preponderant evidence show[ed] that [mother] did commit maltreatment of a minor by failing to protect a child from actions that endanger a child's physical health when reasonably able to do so." On behalf of the commissioner, the co-chief HSJ entered an order adopting the HSJ's recommendation.

Mother appealed the commissioner's decision to the district court per Minnesota Statutes section 256.045, subdivision 7 (2022). The district court ordered the parties to submit briefs and supporting documentation. The district court later affirmed the agency's final decision.

This appeal follows.

## DECISION

***This court reviews the agency decision, not the district court decision, under Minnesota Statutes section 14.69 (2022).***

Mother contends that the district court committed clear and reversible error by affirming the agency's maltreatment determination based on the commissioner's findings of fact, without reviewing the record. By asking this court to review the district court's decision, however, mother's argument misses the mark.

"[W]hen judicial review is authorized under Minn. Stat. § 256.045, the district court is engaged in appellate review . . . ." *Zahler v. Minn. Dep't of Hum. Servs.*, 624 N.W.2d 297, 301 (Minn. App. 2001), *rev. denied* (Minn. June 19, 2001). And when "the trial court . . . itself act[ed] as an appellate tribunal with respect to the agency decision, this court will independently review the agency's record." *In re Hutchinson*, 440 N.W.2d 171, 175 (Minn. App. 1989). "[T]he scope of review is governed by Minn. Stat. § 14.69." *Zahler*, 624 N.W.2d at 301. We may affirm the agency's decision or remand the case for further proceedings. Minn. Stat. § 14.69. This court may also reverse or modify the agency's decision if the petitioner's substantial rights may have been prejudiced because the agency's decision is, as relevant here, "unsupported by substantial evidence in view of the entire record[,] as submitted[.]" *Id.*; *see also Zahler*, 624 N.W.2d at 301.

"Agency decisions enjoy a 'presumption of correctness' and warrant deference by courts." *Kind Heart Daycare, Inc. v. Comm'r of Hum. Servs.*, 905 N.W.2d 1, 9 (Minn. 2017) (quoting *Rsrv. Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977)). "The

commissioner's factual findings are reviewed under the substantial-evidence test, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zahler*, 624 N.W.2d at 301 (quotation omitted). "Substantial evidence has also been defined as: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety." *In re O'Boyle*, 655 N.W.2d 331, 334 (Minn. App. 2002) (quoting *Rsrv. Mining Co.*, 256 N.W.2d at 825).

"If [the commissioner] engage[d] in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cannon v. Minneapolis Police Dep't*, 783 N.W.2d 182, 189 (Minn. App. 2010) (quoting *Cable Commc'ns Bd. v. Nor-W. Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn. 1984)). "We defer to [the commissioner's] conclusions regarding conflicts in testimony . . . and the inferences to be drawn from testimony." *In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001).

With this standard of review in mind, we next independently review the commissioner's decision.

***Substantial evidence supports the commissioner's decision.***

The HSJ's factual findings, which underlie the commissioner's decision, are largely based on the Hennepin County Child Protection Assessment Summary and Chronology and daughter's treatment records. As explained below, after independently reviewing the record on appeal—including the aforementioned documentary evidence—we conclude that

substantial evidence supports the HSJ's factual findings and the commissioner's decision, and that the commissioner engaged in reasoned decision-making.

Maltreatment includes "neglect under subdivision 15." Minn. Stat. § 260E.03, subd. 12(2) (2022). Under Minnesota Statutes section 260E.03, subdivision 15(2) (2022), "failure to protect a child from conditions or actions that seriously endanger the child's physical or mental health when reasonably able to do so" constitutes maltreatment. And a "[t]hreatened injury" means "a statement, overt act, condition, or status that represents a substantial risk of physical or sexual abuse or mental injury." Minn. Stat. § 260E.03, subd. 23(a) (2022).

In the agency's maltreatment-determination letter, the agency stated that "there [was] a preponderance of the evidence to support a finding of sexual abuse, threatened sexual abuse, and neglect." There is substantial evidence in the record to support this determination.

Even setting aside the underlying abuse and mother's response in 2016, the record amply reflects that mother failed to protect daughter in 2020 from a substantial risk of additional physical or sexual abuse by son, as well as from mental injury. In early March 2020, daughter reported to the school resource officer that she was having suicidal ideations relating to the abuse she had suffered from son. Despite repeated requests by the child-protection investigator beginning as early as March 11, mother refused to require son to leave the home, even though father agreed that son could move into his residence. After her CornerHouse interview, daughter's treatment records reflect mounting mental-health concerns that coincided with her deteriorating relationship with mother—who vacillated

11

between ignoring daughter, "verbally beating her up," and telling her to "just get over it"—and son—who aggressively accused daughter of ruining his life and yelled at her that she had "'screwed things up' with the family."

By April 15, daughter had transferred to inpatient-hospital care "due to increasing safety concerns including suicidal ideation with a plan." Meanwhile, son provided a mid-April confession to abusing daughter, and he admitted that "everyone's capable" of reoffending. All that time, mother resisted the investigator's attempts to persuade her to move son out of the home or otherwise arrange for no contact between son and his siblings. This remained the status quo, even after the investigator informed mother's attorney that the agency was preparing to file a CHIPS petition and that son needed to leave because the state was charging him with two counts of first-degree criminal sexual conduct. It was not until April 20 that mother's attorney notified the agency that son had moved out, and it was not until April 29 that the agency could finally confirm son had left.

Mother insists that, "[d]ue to financial constraints and strict COVID-19 protocols at the time, [it] was not reasonable for the family to immediately accommodate" the agency's request that son leave the home. But the commissioner did not credit mother's report that she could not find an alternative place for son to live, and we defer to that credibility determination. *See Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d at 278; *see also Zahler*, 624 N.W.2d at 303 ("[W]here factual issues are contested, 'the conclusions reached by the referee will necessarily be supported by one party and disputed by the other.' It is within the referee's province to determine credibility and such

decisions should not be reweighed." (quoting *Youa True Vang v. A-1 Maint. Serv.*, 376 N.W.2d 479, 482 (Minn. App. 1985))).

In sum, having considered the record before us in its entirety, we conclude that there is "such relevant evidence as a reasonable mind might accept as adequate to support" the commissioner's decision. *Zahler*, 624 N.W.2d at 301 (quotation omitted). Substantial evidence—more than a scintilla—supports the agency's maltreatment determination that mother failed to protect daughter from conditions that seriously endangered daughter's physical and mental health while daughter was facing a substantial threatened risk of physical abuse, sexual abuse, and mental injury. *See* Minn. Stat. § 260E.03, subds. 15(2), 23(a); *see also O'Boyle*, 655 N.W.2d at 334. The record supports the commissioner's decision that, despite being reasonably able to do so, mother failed to protect daughter when she refused to require son to move out of the home during the agency's 2020 investigation. *See* Minn. Stat. § 260E.03, subds. 15(2), 23(a). We therefore conclude that the commissioner engaged in reasoned decisionmaking in upholding the agency's maltreatment determination under Minnesota Statutes section 260E.03, subdivision 15(2).

***Mother's procedural-due-process argument is forfeited.***

Mother maintains that the agency's reliance on a previously "screened out" child-protection report from 2016 amounts to a violation of her right to procedural due process. The agency responds that we should not consider mother's procedural-due-process argument because she did not raise it in any of the underlying proceedings. We agree with the agency.

Before filing a notice of appeal to this court, mother never argued that the agency had violated her right to procedural due process by considering her 2016 response to son's abuse of daughter in reaching the maltreatment determination.[2] "A reviewing court must generally consider only those issues that the record shows were presented and considered by the trial court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quotation omitted); *see also In re A.D.*, 883 N.W.2d 251, 261 (Minn. 2016) (citing *Thiele* as applicable to an appeal arising from a final administrative decision). And a party may not "obtain review by raising the same general issue litigated below but under a different theory." *Thiele*, 425 N.W.2d at 582. Mother has forfeited her procedural-due-process argument, and we therefore decline to address it. *See Stone v. Invitation Homes, Inc.*, 4 N.W.3d 489, 493–95 (Minn. 2024) (rejecting appellant's attempt to raise legal argument for first time on appeal as forfeited).

**Affirmed.**

---

[2] Mother did make a factual assertion in her notice of appeal to the district court that "[t]he allegations made against [son] were stale, were previously reported, and screened out by Child Protection." But mother did not allege a violation of her procedural-due-process rights. Nor did she raise such a claim before the agency in the first instance.